# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔯𝔰𝔱 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

*IN RE LABATON SUCHAROW LLP,*
*Petitioner*

*Petition for Writ of Mandamus to the United States District*
*Court, District of Massachusetts*
*(No. 11-cv-10230-MLW)*

## PETITION FOR WRIT OF MANDAMUS

Joan A. Lukey (First Circuit Bar No. 14225)
Justin J. Wolosz (First Circuit Bar No. 70575)
Stuart M. Glass (First Circuit Bar No. 64338)
Choate, Hall & Stewart LLP
Two International Place
Boston, MA  02110
(617) 248-5000
joan.lukey@choate.com
jwolosz@choate.com

***Attorneys for Petitioner Labaton Sucharow LLP***

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

RELIEF SOUGHT BY THE PETITIONER ...........................................1

ISSUES PRESENTED IN THE PETITION .............................................2

STATEMENT OF FACTS .....................................................................5

      A.     The Litigation. ...................................................................6

      B.     The Attorneys' Fees Award....................................................6

      C.     Counsel Advises the Court of an Error in the Fee Petition. .............7

      D.     The Court Appoints the Master. ...........................................8

      E.     Relevant Proceedings Following the Filing of the Master's
           Report.........................................................................11

      F.     The Court Denies Labaton's Motion to Recuse. ...........................14

      G.     The *De Novo* Proceedings. ..................................................17

REASONS WHY THE WRIT SHOULD ISSUE ...................................18

I.     This Court Should Issue a Writ of Mandamus Requiring the District
      Court's Recusal under 28 U.S.C. § 455(a) Because a Reasonable
      Person May Question the Court's Impartiality...............................18

      A.     A Reasonable Person Might Question the Court's Impartiality
           Based Upon its *Ex Parte* Communications with the Master,
           and Reliance Upon Media Reports That Did Not Even Relate
           to ATRS or the SST Case. ..................................................20

      B.     A Reasonable Person Might Question the Court's Ability to
           Decide Impartially Who Was Responsible for Determining or
           Disclosing The Existence of Any Fee Division from
           Customer Class Counsels' Fee Award. .....................................24

      C.     A Reasonable Person Might Question the Court's Ability to
           Decide Impartially Whether the Special Master's
           Compensation Was Excessive. ..............................................26

II.   Absent A Writ of Mandamus Requiring the District Court's Recusal, Labaton and the Judicial System Will Suffer Irreparable Harm. .................27

III.  The Balance of Equities Favors This Court's Issuance of a Writ Requiring the District Court's Recusal.........................................................29

CONCLUSION ...........................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accusoft Corp. v. Palo*,
   237 F.3d 31 (1st Cir. 2001)................................................................31

*In re Boston's Children First*,
   244 F.3d 164 (1st Cir. 2011)..............................................................21

*In re Brooks*,
   383 F.3d 1036 (D.C. Cir. 2004).........................................................25

*In re Bulger*,
   710 F.3d 42 (1st Cir. 2013).............................................20, 21, 29, 31

*In re Cargill, Inc.*,
   66 F.3d 1256 (1st Cir. 1995)...............................................................1

*Edgar v. K.L.*,
   93 F.3d 256 (7th Cir. 1996) ...............................................................25

*Fowler v. Butts*,
   829 F.3d 788 (7th Cir. 2016) .............................................................30

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988)...........................................................................21

*Liteky v. United States*,
   510 U.S. 540 (1994)................................................................21, 23, 24

*In re Martinez Catala*,
   129 F.3d 213 (1st Cir. 1997)..............................................................20

*Stein v. Mutuel Clerks' Guild, Inc.*,
   560 F.2d 486 (1st Cir. 1977)..............................................................22

*In re United States*,
   158 F.3d 26 (1st Cir. 1998)................................................................21

*In re United States*,
   441 F.3d 44 (1st Cir. 2006)................................................................21

*United States v. Balistrieri,*
   779 F.2d 1191 (7th Cir. 1985) ............................................................30

*United States v. Cepeda Penes,*
   577 F.2d 754 (1st Cir. 1978)..............................................................24

*United States v. Craven*,
   239 F. 3d 91 (1st Cir. 2001)...............................................................23

*In re Vasquez-Botet*,
   464 F.3d 54 (1st Cir. 2006).........................................................20, 31

**Statutes**

28 U.S.C. § 455(a) ..............................................................................*passim*

All Writs Act, 28 U.S.C. § 1651 ..................................................................1

**Other Authorities**

Brian Amaral, *Judge Will Allow Class to Object to $75M State Street
   Fees,* Law360 (Mar. 24, 2017) ..........................................................29

Brian Amaral, *Special Master to Probe $75M Fee Request in State St.
   Deal,* Law360 (Mar. 7, 2017)............................................................29

Chris Villani, *3 Firms Accused of Misconduct in Billable Hours
   Probe,* Law360 (May 30, 2018).........................................................29

Chris Villani, *3 Firms To Pay $800K More Amid Billable Hour
   Probe,* Law360 (Apr. 24, 2018).........................................................29

Chris Villani, *Labaton Asks for Judges' Communications in $75M Fee
   Fight,* Law360 (June 22, 2018) ..........................................................30

Chris Villani, *Labaton Sucharow Can't Get Judge Recused in $75M
   Fee Row,* Law360 (June 21, 2018)......................................................30

Chris Villani, *Law Firms Want Mass. Judge Recused in $75M Fee
   Fight*, Law360 (June 15, 2018) ...........................................................30

Chris Villani, *Plaintiff Linked to $75M Attys' Fees Flap Wants to Stay
   On,* Law360 (June 7, 2018) ................................................................30

Debra Cassens Weiss, *Special Master Who Reviewed Billing in $300M Case Recommends Significant Refund, Judge Says,* ABA JOURNAL (June 4, 2018) ...................................................................30

Fed. R. App. P. 21 ........................................................................1

Fed. R. Civ. P. 23(e)............................................................5, 19, 27

Fed. R. Civ. P. 23(h) ...........................................................*passim*

Fed. R. Civ. P. 23(h)(1)................................................................26

Fed. R. Civ. P. 52(a)(6).................................................................31

Fed. R. Civ. P. 53(b)(4).................................................................28

Fed. R. Civ. P. 53(f)(3) .................................................................18

Fed. R. Civ. P. 54(d)(2)......................................................5, 12, 19, 26

Fed. R. Civ. P. 54(d)(2)(B)(iv) ....................................................26

Jack Newsham, *Law Firms That Double-Billed for Staff Attys. Face $2M Probe*, LAW360 (Feb. 6, 2017)....................................29

Mass. R. Prof. C. 1.5(e) .............................................................11

Mass. R. Prof. C. 3.3 ..............................................................5, 19

Max Brantley, *Arkansas Teacher Retirement Lands in Middle of Dispute Over Class Action Legal Fees*, ARKANSAS TIMES (May 31, 2018) ................................................................................30

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this petition for a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651. *See, e.g.*, *In re Cargill, Inc.*, 66 F.3d 1256, 1259 (1st Cir. 1995) ("Federal appellate courts are empowered to issue prerogative writs that are 'necessary or appropriate in aid of their respective jurisdictions' under the All Writs Act . . . Mandamus is such a writ.").

## RELIEF SOUGHT BY THE PETITIONER

Petitioner, Labaton Sucharow LLP, lead counsel for the plaintiffs in three class action lawsuits against State Street Bank and Trust Company ("SST") consolidated for pre-trial purposes (Appx. 470-71[1]), (*Arkansas Teacher Retirement System v. State Street*, No. 11-10230-MLW; *Henriquez et al. v. State Street*, No. 11-12049-MLW; *The Andover Cos. Employee Savings and Profits Sharing Plan v. State Street*, No. 12-11698-MLW), hereby petitions, pursuant to 28 U.S.C. § 1651 and Rule 21 of the Federal Rules of Appellate Procedure, for a writ of mandamus directing the Honorable Mark L. Wolf to vacate his order denying petitioner's motion for recusal pursuant to 28 U.S.C. § 455(a) and recuse himself from presiding further in this action.

---

[1]    Citations to "Add. [#]" refer to the page numbers in the Addendum attached to this petition; citations to "Appx. [#]" refer to page numbers in the separately-bound Appendix of Exhibits, and citations to "Sealed Appx. [#]" refer to page numbers in the separately bound Sealed Appendix of Exhibits.

## ISSUES PRESENTED IN THE PETITION

In this civil proceeding to determine whether a percentage-of-fund class action fee award should stand in light of a lodestar reporting error and an undisclosed fee division with the law firm that facilitated Labaton's introduction to named plaintiff Arkansas Teacher Retirement System ("ATRS"):

(1) With regard to the Court's *sua sponte* questioning and comments regarding "questions" of possible public corruption at the May 30, 2018 hearing,[2] could a reasonable person question the impartiality of the Court where (a) the Court now acknowledges a previously undisclosed *ex parte* communication in January 2018, in which the Master told the Court that he had been contacted by an Assistant U.S. Attorney ("AUSA") who stated that a federal investigation of the Thornton Law Firm ("Thornton"), was underway in Boston purportedly regarding, *inter alia*, "whether a possible illegal payment had been made to an official of a pension fund," and inquired as to whether she could obtain any relevant materials that he may have gathered (Add. 39);[3]  (b) the Court now acknowledges that the

---

[2]     Among other things, the Court stated, "…I think it is foreseeable that when the  Report becomes public, there are going to be questions about the origin of this relationship and *whether all those millions of dollars stopped with Mr. Chargois*" (emphasis added).  Appx. 251.

[3]     The unidentified pension fund was not ATRS, which the Court stated would require an "expan[sion]" of the existing investigation.  Add. 39. The Court directed that the AUSA be told that a grand jury subpoena or motion in his court would be required.  There was no follow-up. Add. 39-40.

Court and the Master discussed at that time that the investigation "suggested questions about whether any of the money paid to Chargois had been used to make political contributions or other payments, and the potential for the criminal investigation to expand to include Chargois" (although there was apparently no such suggestion by the AUSA) (*id*.); and (c) the Court and the Master did not disclose to the parties in this action either the AUSA's outreach in an investigation that did not relate to ATRS or Labaton, or their surmise that the investigation would pose "questions" about the "potential for the [unrelated] criminal investigation to expand to include Chargois" (*id*).[4]

(2)    With regard to the May 30, 2018 hearing, could a reasonable person question the impartiality of the Court where (a) the Court ordered George Hopkins ("Hopkins"), the Executive Director of Plaintiff Arkansas Teacher Retirement System ("ATRS"), to appear in Boston on five days' notice (Add. 47) for the purpose of obtaining information to determine "whether ATRS continues to be an adequate representative of the class" (*id*. at 4); (b) the Court's concerns regarding ATRS' adequacy were based "in meaningful measure" on "a concern that ATRS' long and continuing relationship with Labaton might keep it from vigorously advocating the interests of the class" in a manner adverse to Labaton (*id.* at 4-5);

---

[4]    This appears to have been speculation on the part of the Court and the Master, given that the investigation did not relate either to ATRS or to Labaton. Add. 6, 39

(c) the Court appeared to have reached conclusions against Labaton regarding

matters that were hotly disputed, e.g., that Labaton made "an assiduous effort to

keep [the details of the Chargois relationship] from counsel in the case and others"

(*id*. at 54), although the Court had yet to conduct a *de novo* review, to read the

Report & Recommendations ("Report") thoroughly (Appx. 248),  to read all of the

exhibits (*id.* at 260), or to read Labaton's expert reports at all (*id*. at 345-46; (d) the

Court also acknowledges that it was influenced by a January, 2017 article in *The*

*Boston Globe* regarding political contributions by Labaton and Thornton partners

in Massachusetts, which, in conjunction with the AUSA inquiry to the Master,

raised a "question[]"in the Judge's mind of public corruption in Arkansas (Add.

60), (e) all against a backdrop of a voluminous Report that included no such

finding.[5]

(3)     With regard to the rulings that the Court must make in the *de novo*

proceedings, could a reasonable person question the impartiality of the Court

where the Court will be called upon to determine (a) who is responsible, as

between the Court itself and Labaton, for the non-disclosure of the fee division to

---

[5]     The Master now suggests that he hinted at this issue in footnote 111 of his
Report at p. 125, indicating that he did not investigate the origins of the
ATRS/Labaton relationship because it was beyond the scope of his appointment.
Sealed Appx. 122-24.

the Court and class; [6] and (b) whether the Master's $3,800,000 fee, approved by the Court without opportunity for the parties to be heard, was appropriate.

## STATEMENT OF FACTS

Following approval of a $300 million settlement, and a corresponding $74,541,250 attorneys' fee award based on a percentage-of-fund method (*see* Appx. 114-18), the Court ordered further review of the fees after *The Boston Globe* raised a question, and the law firms self-reported, inadvertent double-counting of certain staff or contract attorneys in the lodestar submissions provided by Customer Class Counsel[7] for the Court's "cross check" on the fee award.  Appx. 174-76.[8]  To conduct the review, the Court appointed recently retired federal judge Gerald Rosen of JAMS as a Master.  Appx. 201-02 (the "Appointment Order").  During his investigation, the Master learned that the Customer Class Firms divided the fee awarded to them with Chargois & Herron, a Texas/Arkansas law firm that

---

[6]    The Court does not respond to this second basis for Labaton's §455(a) motion in its Recusal Opinion.  *See* Addendum.

[7]    Labaton, Thornton, and  Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") are collectively referred to herein as "Customer Class Counsel" or the "Customer Class Firms."

[8]    The Court did not rescind, revoke or vacate the award of fees, which still stands.

had facilitated an initial introduction between Labaton and ATRS but had done no work on the SST case.[9]  *See* Appx. 567-68.

A.    **The Litigation.**

The Plaintiffs in the underlying litigation alleged that SST overcharged customers on certain foreign currency exchange transactions.  In July 2016, the parties agreed to settle for $300 million.  Appx. 9.  The settlement class included all custody and trust customers of SST during the defined time period who executed FX transactions, with certain exceptions.  Appx. 18.  Of the total settlement amount, $60 million (the "ERISA Settlement Allocation") was earmarked for ERISA Plans and certain other class members eligible to participate in the ERISA portion of the settlement.  Appx. 10.

B.    **The Attorneys' Fees Award.**

Approximately six weeks after reaching a settlement, Labaton, as Lead Counsel, moved for a total attorneys' fee award of $74,541,250.00, plus expenses, and service awards for the named plaintiffs.  Appx. 109.

The Court, without inquiring as to the allocation of fees among counsel, found the total fee request to be reasonable and approved the motion.  *See* Appx. 153 (November 2, 2016 Hearing Tr.); Appx. 114 (Award).  The Court used a common fund approach in determining the appropriate award of fees, along with a

---

[9]    Labaton's citation of the Report for  uncontested matters does not constitute a waiver of objections to disputed findings and rulings.

lodestar cross-check. *Id.*.  The Court noted that  24.48% of the settlement fund is

typical of awards in comparable common fund cases that the Court had approved

(id.), and that an award of 1.8 times the lodestar of approximately $41 million was

reasonable.  Appx. 154.

### C.    Counsel Advises the Court of an Error in the Fee Petition.

Shortly after the approval of the settlement and award of attorneys' fees, a

reporter from *The Boston Globe* raised questions based upon review of the lodestar

reports as to whether the fee petition had double-counted time spent by certain

attorneys.  Counsel immediately investigated the matter; and on November 10,

2016, counsel for Labaton submitted a letter to the Court disclosing an error.  *See*

Appx. 158 (Letter from D. Goldsmith ("Goldsmith") to the Hon. Mark L. Wolf).

As explained in Goldsmith's letter, the submissions in connection with

counsels' fee petitions included a number of professionals identified as "Staff

Attorneys" or "SAs."  *Id.*.  These individuals worked principally on "reviewing and

analyzing the millions of pages of documents produced by State Street" during the

litigation.  Appx. 158-59.  In an effort to share costs among counsel, the financial

responsibility for several SAs of Labaton and Lieff, as well as certain Contract

Attorneys from Lieff,[10] was borne by Thornton.  Appx. 159; Appx. 643 (Report).

When Labaton, Lieff, and Thornton submitted their respective lodestar reports for

---

[10]      Labaton did not utilize Contract Attorneys.

the fee petition, some attorneys' hours were accidentally included in two firms' reports.  Appx. 159.

Goldsmith explained that, due to these inadvertent errors, counsels' reported combined time and lodestar were overstated.  *Id.* at 159.  The reported 86,113.7 hours should have been reduced by 9,322.9, and the reported lodestar of $41,323,895.75 should have been reduced by $4,058,654.50.  *Id.*  Goldsmith corrected the fee petition by removing the duplicative time, noted that the resulting multiplier was 2.0, not 1.8 as previously stated, and suggested that this multiplier remained within the range of multipliers found reasonable in this circuit.  *See id*. at 3.

### D.    The Court Appoints the Master.

Following the issuance of a Memorandum and Order indicating his intention to do so (*see* Appx. 163-64), the Court orally appointed former United States District Judge Gerald Rosen Judge Rosen as Master at a March 7, 2017 hearing and issued a formal order to that effect the next day.  *See* Appointment Order, *Id.* at 200.  In order to pay for the investigation, the Court required Labaton to pay into court $2,000,000 (eventually increased to $3.8 million) from the Customer class counsel's attorneys' fee award.  *Id.* at 205.

The investigation consumed fourteen months, "the production of 200,000 pages of documents," "34 witnesses interviews and 63 depositions."  Appx. 469.

The Master filed his 377-page Report, along with an Executive Summary and approximately 10,000 pages of exhibits, under seal on May 14, 2018. *Id.* at 463.

The Report includes a number of findings and conclusions with respect to the double-counting issue and related rate questions. As to Labaton, the Master concluded that the billing rates used in Labaton's lodestar for all categories of attorneys were reasonable (*id.* at 635-643); and that (other than the self-disclosed double-counting issue) the total number of hours and specificity of time entries were also reasonable (*id.* at 675-77). The Master concluded that the double-counting error was inadvertent. He nonetheless recommended a $4.1 million "disgorgement" from all three of the Customer Class Counsel firms, to be paid to the class. *Id.* at 681-86; 825-26. Labaton has challenged this recommended "remedy."

On a separate topic, the Master learned during the course of his investigation that, after the fee award to the three Customer Class Counsel firms, those firms divided that fee with another law firm, Chargois & Herron, paying the latter $4,102,549.43 and allocating the balance among themselves. Chargois & Herron had facilitated Labaton's initial introduction to ATRS (Appx. 551-85), and, with certain exceptions, the two firms agreed that Chargois & Herron was to receive up to 20% of Labaton's fee in certain class actions in which Labaton was lead or co-lead counsel and ATRS a named plaintiff . Appx. 555. Labaton, Lieff and

Thornton agreed with Damon Chargois that, for the SST case, the payment would be calculated as 5.5% funded by the three firms from their respective shares. Appx. 567-68.  The payment was calculated on the basis of, and paid from, the fees awarded by the Court to Customer Class Counsel.  *Id.*  That award has never been rescinded or modified.  *Id.* 116.

Massachusetts is among the minority of states that permits the division of fees with an attorney who neither assumes liability for a case nor does any work on the case (sometimes called a "bare referral fee," although the governing rule applies to all fee divisions between lawyers not in the same firm, regardless of nomenclature).[11]  *See* Massachusetts Rule of Professional Conduct 1.5(e).  Despite the permissibility of such fees in the Commonwealth, the Master openly disapproved of such arrangements, particularly at high dollar levels.  Indeed, he referred critically of the fact that Chargois did "no work" on the case at least 25 times in the Report.  *See, e.g.*, Appx. 469, 723 n.209, 739, 759, 769, 816.  In addition, although the Court did not order disclosure of the fee arrangements (*see* Fed. R. Civ. P. 54(d)(2), Fed. R. Civ. P. 23(h), and Sealed Appx. 34), the Master

---

[11]    The Master rejects the classification of the payment as a "referral fee" (Appx. 734), without apparent recognition that Rule 1.5(e) of the Massachusetts Rules of Professional Conduct applies to all fee divisions, however designated, between "lawyers who are not in the same firm."

- 10 -

found that Labaton was obligated to, but did not, disclose the fee division to the Court or the class, among others.  Appx. 708-88.

**E.    Relevant Proceedings Following the Filing of the Master's Report.**

 The parties filed several motions in the weeks following the filing of the Report under seal.  The Court set a hearing for one such motion for May 30, 2018, but also added an unrelated issue.  Appx. 236.  Specifically, the Court ordered George Hopkins ("Hopkins") the Arkansas-based Executive Director of ATRS to attend the hearing on five days' notice, in order to determine whether ATRS should be removed as class representative due to an unspecified "conflict."  *Id.* at 238.

At the May 30 hearing, the Court acknowledged that (a) it had not yet received Labaton's Objections to the Master's Submission (which were not yet due); (b) it was aware that "many of the [Master's] . . . findings of recommended . . . fact and rulings of law, are very vigorously disputed" (Appx. 246); (c) it had not yet "studied the Report & Recommendation or the exhibits as deeply as [he] will" eventually (*id*. at 248); and (d) it "ha[d]n't read all the exhibits" (*id*. at 260), including the reports of Customer Class Counsels' experts (Appx. 345-46).  The Court called Hopkins to the stand, placed him under oath, and questioned him in open court.  The questioning strongly suggested that the Report – which was not yet public – involved an investigation of possible public

corruption in connection with the origin of the ATRS/Labaton relationship. Although to this point there had been no such contention in the proceedings, and no finding of public corruption in the sealed Report, the Court questioned Hopkins extensively, including with regard to a former state legislator who had been mentioned in the Report only once, as the friend of Chargois & Herron partner Tim Herron who facilitated an introduction to ATRS for Herron's firm and for Labaton. Each response by Hopkins rebutted any implication of public corruption.

The Court then asked Hopkins whether he was aware that Labaton had been accused of misconduct, and whether, "particularly if I find that Labaton engaged in misconduct, that finding could also be harmful to Arkansas Teacher's reputation." *Id*. at 311. He went on to say that: "you know that questions have been raised by the Report & Recommendation with Arkansas Teacher, and they're just questions. But to the extent that those issues are litigated in this case, they could be at least embarrassing to [ATRS]." Appx. 316.[12]

Hopkins replied: "you seem to assume that, you know, how Labaton became associated with ATRS was in some way improper, illegal, or untoward, and I don't think the record shows that. In fact, the record specifically says they [apparently the Master and his attorney] didn't even inquire into that area." Appx.

---

[12]     This was a curious statement, in that the Master had expressly *not* addressed the origins of the ATRS/Labaton relationship, finding the topic to be outside the scope of his appointment. Appx. 587 n. 111.

318.  The Court denied any implications from his questioning, but suggested that "it raises questions."  *Id*.  The Court ordered Hopkins to "think about it" and provide a subsequent written submission regarding, among other things, whether "you want to require that I decide whether [ATRS] should be allowed to continue as lead plaintiff."  Appx. 318-19.

Labaton's counsel, Joan Lukey, requested a side bar with the Court upon the conclusion of the Judge's examination.  At sidebar, Lukey asked that she be permitted to state in open court that "the issue raised by the Special Master is whether a bare referral fee, or forwarding fee, was paid to the attorney who introduced Arkansas, and . . . the issue before the Court is whether the failure to disclose that bare referral fee was improper."  Appx. 326.  The Court demurred, stating: ". . . I think it is foreseeable that when the Report becomes public, there are going to be questions about the origin of this relationship and *whether all those millions of dollars stopped with* Mr. Chargois*.*"  Appx. 327 (emphasis added).  The Court also added: "Mr. Kelly [counsel to the Thornton Law Firm] was a prosecutor, and *Arkansas these days is – ears may perk up.*"  *Id*. (emphasis added).  When Lukey asked incredulously whether the Court meant to suggest there was a potential issue involving Mr. Faris and any monies paid, the Court replied: "yes, those questions occur to me when I read it" (*id*.), the latter pronoun presumably referring to the Master's Report, although the Report contained no such finding.

Lukey strenuously objected to the Court's statements, pointing out the total absence of any such contention in the Master's Report, such that "the suggestion that that's at play here shocks me."  Appx. 328.  Lukey continued, "[y]ou're suggesting public corruption.  Honestly, your Honor, I am appalled that that was even said."  *Id.*  The Court denied having already formed an opinion that public corruption had occurred, but noted: "I've formed the opinion that those are questions that are raised."  Appx. 331.  The Court did not disclose any such questions to the parties in advance of the hearing or to Hopkins before putting him under oath and interrogating him without the benefit of counsel.  Appx. 285-319.

### F.     The Court Denies Labaton's Motion to Recuse.

On June 8, 2018, Labaton filed a motion pursuant to 28 U.S.C. § 455(a), asking the Judge to consider recusing himself because, as a result of the events at the May 30 hearing, in conjunction with the conflict position in which he stood for purposes of the *de novo* proceedings, "his impartiality might reasonably be questioned."  Two weeks later, the Judge denied the motion, stating that he would later supply a "full explanation" including by providing information about *ex parte* communications between the Court and the Master[13], and responses to the core contentions and allegations in the motion.  Appx. 370.  On Thursday, June 28, the

---

[13]     On June 22, Labaton had filed a motion asking the Court to compel the Master to disclose any such *ex parte* communications.  Appx. 458-62.  That motion was denied on June 28.  *Id.* at 1060.

Court issued a 72-page Memorandum and Order explaining its reasons for declining to self-recuse. Add. 1-72 (the "Recusal Opinion").

In the Recusal Opinion, the Court argued that it only questioned the Executive Director about public corruption at the May 30 hearing in order to assess whether ATRS "is now a typical and adequate representative of the class" in the face of media reports,[14] and *ex parte* communications with the Master about other investigations (Add. 59-61) that do not involve ATRS or Labaton.[15]

The Court then discussed its *ex parte* communications with the Master, contending that all such communications were "limited to administrative matters," and thus did not support questions about the Court's impartiality. Add. at 65.[16] But, the Court acknowledged a communication in January of 2018 in which the Master discussed being approached by a Boston AUSA requesting information about Thornton to use in a pending investigation of Thornton "including whether a possible illegal payment had been made to an official of a pension fund," not related to ATRS. *Id.* at 39. The Judge admitted that, in the conversation about the AUSA, he and the Master together speculated "*that prosecutors' investigation*

---

[14]    The media reports contain no suggestion of public corruption regarding ATRS.

[15]    *See supra* note 3.

[16]    The Court acknowledges in the Recusal Order that he expressly told the parties when he appointed the Master, that "I want to minimize any *ex parte* communications with me because I'll need to decide objections to [the Master's] report and recommendation." Add. 29.

- 15 -

*suggested questions about whether any of the money paid to [] Chargois had been used to make political contributions or other payments, and the potential for the criminal investigations to expand to include Chargois*." *Id.* at 39. This conversation was not disclosed to the parties until issuance of the Recusal Opinion five months later. Had Labaton not filed the recusal motion, presumably it would never have been disclosed.

The Court acknowledged in the Recusal Opinion that, in addition to the *ex parte* communication with the Master in January regarding the federal investigation of Thornton relating to an unrelated pension fund, his expectations about media focus on "the origins of Labaton's relationship with ATRS when the Master's Report was unsealed," were based on a January 2017 article in *The Boston Globe* concerning Labaton's and Thornton's partner's campaign contributions in Massachusetts to the state treasurer and country treasurer.[17] Add. 6. The Court also did not disclose this reliance to the parties until issuance of the Recusal Order, nor did the Court ever inquire of Labaton concerning the accuracy of the unrelated newspaper article.

---

[17]     The Court references articles in *The Boston Globe* at least twelve times in his Recusal Opinion. *Add.* 2,6, 23, 24, 25, 26, 27. The references appear to relate to a handful of articles on two topics: the lodestar issue, and political contributions in Massachusetts by Labaton and Thornton unrelated to ATRS and the SST case.

G.    **The *De Novo* Proceedings**.

The Court is now required to conduct a *de novo* review of the Master's

Report & Recommendations.  Fed. R. Civ. P. 53(f)(3).  Other than the double-

counting issue, as to which the Master found inadvertence but no wrongdoing

against Labaton (Report at 363), the *de novo* review as to Labaton focuses on

whether Labaton was required to disclose the fee division with Chargois & Herron

to the court and the class.[18]

With regard to the disclosure issues, the single most important issue is

whether Labaton, and perhaps others, were obligated to disclose the fee allocation

to the Court.  (The class's entitlement to disclosure, if any, is derivative of the

Court's entitlement to same.)  *See* Sealed Appx. 91; Sealed Appx. 34.  This, in

turn, depends on whether Fed. R. Civ. P. 54(d)(2) and 23(h) govern the obligation

to disclose as Customer Class Counsel and their witnesses contend, or Fed. R. Civ.

P. 23(e) governing class settlements trumps Fed. R. Civ. P. 23(h) governing

attorneys' fees, and Rule 3.3 of the Massachusetts Rules of Professional Conduct

trumps the Federal Rules as the Master contends and his witness contends.

In the present circumstances, to the extent the Court contends that it would

have acted differently on the fee petition had it been aware of the fee division with

---

[18]    The Master also suggested obligations to the client and other counsel that are
dealt with in Labaton's Objections to the Report, and in Customer Class Counsels'
expert report.

Chargois & Herron, it would be required to decide whether it was responsible for failing to ask, or Customer Class Counsel were responsible for failing to disclose. A reasonable person might well question whether the judge who neglected to ask could make that decision impartially.

## REASONS WHY THE WRIT SHOULD ISSUE

**I.      This Court Should Issue a Writ of Mandamus Requiring the District Court's Recusal under 28 U.S.C. § 455(a) Because a Reasonable Person May Question the Court's Impartiality.**

Labaton's petition for a writ of mandamus requiring the Court's recusal under 28 U.S.C. § 455(a) is proper under the standards for both the issuance of writs of mandamus, and recusal under 28 U.S.C. § 455(a).  To secure a writ of mandamus, a petitioner must make "a showing of both clear entitlement to the requested relief and irreparable harm without it, accompanied by a favorable balance of the equities."  *In re Vasquez-Botet*, 464 F.3d 54, 57 (1st Cir. 2006) (citation omitted).  Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  In applying §455(a), the concern "is not [the judge's] actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality."  *In re Bulger*, 710 F.3d 42, 46 (1st Cir. 2013).  Even if the judge has the "inner conviction that he or she can decide the case fairly despite the circumstances,"

recusal is required if there is an appearance of partiality.  *In re Martinez Catala*, 129 F.3d 213, 220 (1st Cir. 1997).

In synthesizing the standards, this Court has explained that it will issue a writ of mandamus requiring recusal under §455(a) when "it is clear that a reasonable person might question [the judge's] ability to remain impartial in hearing the case[.]"  *In re Bulger*, 710 F.3d at 45.  When the motion to recuse is presented directly to the challenged judge under §455(a), the standard only requires the appearance of partiality, not the existence of actual partiality.  In other words, "[t]he judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so."  *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994) (emphasis in original).  This approach advances Congress' intent to ensure that the "courts must not only be, but must seem to be, free of bias."  *In re United States*, 158 F.3d 26, 36 (1st Cir. 1998); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) ("The goal of [§ 455(a)] is to avoid even the appearance of partiality" and to "promote public confidence in the integrity of the judicial process.") (1988) (internal quotation omitted).

Therefore, on a petition for writ of mandamus the Court must "take the objective view of an informed outsider" and decide whether a reasonable, informed outsider "might question the judge's ability to remain impartial in hearing the case[.]"  *In re United States*, 441 F.3d 44, 67 (1st Cir. 2006); *In re Bulger*, 710

F.3d at 45.  Where recusal is a close question, "the balance tips in favor of

recusal."  *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2011).

This Court should issue a writ of mandamus requiring the Court's recusal in

this instance because a reasonable person might question the Court's ability to

remain impartial in ruling *de novo* on the Master's Report.  This is true for at least

three independent reasons.

### A.   A Reasonable Person Might Question the Court's Impartiality Based Upon its *Ex Parte* Communications with the Master, and Reliance Upon Media Reports That Did Not Even Relate to ATRS or the SST Case.

As explained above, at the May 30 hearing the Court raised the question of

public corruption, e.g., money flowing beyond Chargois to a public official, and

acknowledged that a question of public corruption was raised in his mind.  No

comparable suggestion or finding had been made in the Master's voluminous

Report, or previously raised by the Court with the parties.  The Court now

acknowledges that it formulated the belief that this issue had arisen based on two

sources: information conveyed by the Master *ex parte* in January 2018 (Add. 38-

39) regarding a federal investigation of Thornton in connection with a pension

fund (other than ATRS), and an article published on January 28, 2017 (*id*. at 23) in

*The Boston Globe* about Labaton and Thornton partners' political contributions to

a Massachusetts county treasurer and the state treasurer.  *Id*. at 6.  Neither the

federal investigation nor the newspaper article related to ATRS or the SST case,

- 20 -

but the Master and the Court speculated to each other in the January conversation that perhaps the federal investigation in Massachusetts would be expanded to include Chargois.[19]  *Id.* at 39.  This troubling mindset was thus squarely based on *ex parte* communications from extra-judicial sources, *see Liteky v. United States*, 510 U.S. 540, 551, which couldn't be tested through the adversary process because neither the Court nor the Master disclosed them until the § 455(a) motion had already been denied.  *See United States v. Craven*, 239 F. 3d 91, 103 (1st Cir. 2001).

In addition, the Judge chose not to disclose his mindset to the parties between January and May 30, and not to disclose the bases for his mindset until issuance of the Recusal Order in late June.  Nor did he inquire of Labaton regarding the veracity of the *Globe* article about political contributions in Massachusetts, before publicly enunciating the mindset he formed in partial reliance on that article.  Further, the Court's opinion that "questions" were raised, as stated at the May 30 hearing, occurred before the Court had seen or heard Customer Class Counsel's Objections, or reviewed the reports of Labaton's experts.  That the Court could so facilely move from investigation of a civil attorneys' fee dispute to suspicions of criminal conduct based on an investigation

---

19    To the extent that the Master intentionally planted a seed with the Court that he did not see fit to include in his Report, thereby depriving the law firms of the opportunity to defend themselves, such "an inherent risk of taint" cannot be overcome.  *Stein v. Mutuel Clerks' Guild, Inc.*, 560 F.2d 486, 491 (1st Cir. 1977).

of a different law firm and a different fund in a different state, and upon discussion in a newspaper article unrelated to ATRS or the SST case, could well lead a reasonable person to question the Court's impartiality. Such conduct gives the appearance of a "predisposition of a kind that a fair-minded person could not set aside when judging the dispute." *See Liteky*, 510 U.S. at 558.

The Court also acknowledges in his Recusal Opinion that he engaged in an additional *ex parte* communication with the Master, this time on a topic of intense controversy that actually does relate to the SST litigation,[20] to wit: In September, 2017, in order to justify a request to extend the Report deadline, "the Master explained that the Texas lawyer had been paid 5.5% of the approximately $75,000,000 in attorneys' fees I had awarded, and that the payment had not been disclosed [to] all of plaintiffs' lawyers or to me." Add. 36. Later in the Recusal Opinion, the court notes that this *ex parte* communication was also the basis for the Master's request for permission to retain Gillers, and that it "educated me to understand that there may be substantial fees shared with lawyers in class actions that are not disclosed to the court in a request for an award for attorneys' fees." *Id*. at 50, n. 15. Hence the Court specifically asked the question about such attorneys

---

[20] Even if knowledge gleaned from these communications were deemed "judicially acquired," which Labaton does not concede, this Court has held that § 455(a) "permits disqualification of judges even if the alleged prejudice is the result of judicially acquired information." *United States v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir. 1978).

- 22 -

– i.e., the question that he failed to ask in this case – in a March 2018 hearing in another ATRS case. *Id*.

Although the Court described this, and all of its *ex parte* communications with the Master, as merely "administrative," *id*. at 30, a reasonable person might well differ with that characterization. Given the Master's animosity toward the bare referral fee concept through this investigation, his communications on this subject with the Court might reasonably give rise to a perception that an impartial review would no longer be possible. *Cf. Edgar v. K.L.*, 93 F.3d 256, 259-60 (7th Cir. 1996) (finding that off-the-record briefings by court-retained experts to the Judge required recusal under, among other provisions, § 455(a), because "[a] thoughtful observer aware of all the facts . . . would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality.").[21]

---

[21]    The Court attempts to distinguish *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) by construing it to apply only to experts, claiming that the Court "had no communications with Gillers or . . . any discussion with the Master concerning the substance or merits of Gillers' opinions." Recusal Opinion at 66-67 (Appx. 959-960). Respectfully, this attempted distinction misses the point. The Seventh Circuit held: "A thoughtful observer aware of all the facts . . . would conclude that a *preview of evidence* by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." *Edgar*, 93 F.3d at 259-60 (emphasis added). Here, the Court had a preview of evidence from a Master who had become partisan.

Finally, the Court cites *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) to support its claim that the Court's *ex parte* communications with the Master do not put the Court's impartiality reasonably into question.  In *Brooks*, the petitioner merely pointed to time records showing meetings between the Judge and the masters/monitors, plus two statements in opinions noting that the Judge was aware of certain background facts.  *Id.* at 1041.  Here,  the Court affirmatively acknowledges that (a) an *ex parte* communication with the Master, including rank speculating together as to whether a criminal investigation might be expanded to encompass Chargois, and (b) a newspaper article, formed the bases for his belief that questions of public corruption were raised in the SST case.

**B.   A Reasonable Person Might Question the Court's Ability to Decide Impartially Who Was Responsible for Determining or Disclosing The Existence of Any Fee Division from Customer Class Counsels' Fee Award.**

A motion for attorneys' fees must disclose "the terms of any agreement about fees for the services for which the [attorneys' fees] claim is made,"  "if the court so orders."  *See* Fed. R. Civ. P. 54(d)(2)(B)(iv).   Similarly, disclosure to the class must flow through the Court, and also through Fed. R. Civ. P. 54(d)(2).  *See* Fed. R. Civ. P. 23(h)(1) (providing that a "claim for an award must be made by motion under Rule 54(d)(2).").  Because the payment to Chargois & Herron was a permissible "bare referral" fee or fee division as permitted by Mass. R. Prof. C. 1.5(e), no one had an obligation to disclose it to the Court, although the Court

- 24 -

certainly had the discretion to order disclosure if it wished.  Customer Class
Counsels' experts confirm that the responsibility for determining whether fee
divisions are occurring (if that information is sought by the Court, which it most
often is not) falls squarely on the Court, pursuant to FRCP 54(d)(2) and 23(h).  *See
generally* Master's Ex. 234 (Sealed Appx. 4-41); *see also* Master's Ex. 241 at 31-
35 (Sealed Appx. 72 -76).  The Court made no such inquiry here, so there was no
disclosure requirement.

The Master disagrees.  Replying largely on the Supplemental Report of Prof.
Stephen Gillers, he says that Labaton – not the Court – was required to disclose the
fee agreement to the Court pursuant to Mass. R. Prof. C. 3.3, the rule governing the
general "duty of candor" to the Court,[22] and the Master's eleventh hour addition,
Fed. R. Civ. P. 23(e),[23] Appx. 765-771, 780- 788.  Prof.  Gillers' opinions are
based on novel interpretations of  law without supporting authority.  *See, e.g.*,
Master's Ex. 253 (March 20, 2018 deposition of Prof. Stephen Gillers) at 144:24-
145:1 ("I know of no authority that applies 3.3 to the duty to disclose a fee
agreement.") (Sealed Appx.  2);156:20-157:1 (admitting that he knows of no case

---

[22]     The Master also suggests that Rule 11 is implicated; however "because there
is no First Circuit case, either appellate or district, holding that" Rule 11 sanctions
are appropriate for the type of omission the Master claims to have occurred, he
does not recommend any Rule 11 sanction.  Report at 309-318 (Appx. 771 – 80). .

[23]     Fed. R. Civ. P. 23(e) deals with class action settlements, voluntary
dismissals, and compromise.  It makes no reference to attorneys' fees, which are
specifically covered by 23(h).

that requires disclosing a fee division to the class) (Sealed Appx. 3).  Nevertheless, generally adopting Prof. Gillers' opinions, the Master attempts to take Labaton and the experts to task for what he describes as "blame-shifting (largely to the Court)." Report at 362 (Appx. 824); *see also id*. at 306, 355 (Appx. 768, 817). .

The Court will thus be called upon during the *de novo* phase of this attorneys' fee review to select between these differing positions, one of which places responsibility on the Court itself and the other of which diverts it (albeit without support in existing law) to Labaton.  Labaton raised this issue in its recusal motion ( ECF No. 276 at 10 (Appx. 358)) ), but the Court does not directly address it in the Recusal Opinion.  The argument cannot be ignored.

**C.    A Reasonable Person Might Question the Court's Ability to Decide Impartially Whether the Master's Compensation Was Excessive.**

Finally, this Court should direct the lower Court to recuse itself because a reasonable person might question the latter's ability to be impartial (a) in determining whether the extraordinary expense imposed by the Court upon Customer Class Counsel (supplemented twice by the Court from $2,000,000, to $3,000,000 and ultimately to $3,800,000, *see*  ECF Nos. 208, 213 (Appx. 208, 213-16); Add.  at 35 and n.11), all without providing Customer Class Counsel an

opportunity to review, object, or comment) [24] was reasonable; and (b) in determining whether it was reasonable at all to impose these costs on Customer Class Counsel, particularly once the Master's adversarial role became objectively apparent.

In each instance, the Court will be asked to review a course of action that was set in motion by the Court itself, again allowing a reasonable person to question the Court's impartiality on this issue.  The Court's approval of these unusually high and ongoing costs could lead a reasonable person to question whether the Court can maintain the appearance of impartiality in adjudicating past and future cost-related issues, including Customer Class Counsel's Pending Motion for an Accounting and for Clarification that the Master's Role Has Concluded.  *See*  ECF No. 302 (Appx. 454).

## II.    Absent A Writ of Mandamus Requiring the District Court's Recusal, Labaton and the Judicial System Will Suffer Irreparable Harm.

The Court should issue a writ of mandamus requiring the District Court's recusal because both Labaton and the judicial system would otherwise suffer irreparable harm.

---

[24]    In the Recusal Opinion, the Court admits: "I now realize that Federal Rule of Civil Procedure 53(b)(4) requires that the court give the parties notice and an opportunity to be heard before amending an order appointing a Master.  The better practice would have been to devise a way to give the law firm prior notice of the additional payments I was considering ordering in some fashion . . ." Add. 35.

- 27 -

This Court recognizes that damage to the judicial system alone is sufficient to show irreparable harm. *In re Bulger*, 710 F.3d at 49 ("we can leave aside any question of harm personal to the defendant and concentrate on damage to the judicial system . . . . it [is] imperative to act promptly to preclude any reasonable question whether . . . action in the past may affect the fairness of the judicial branch in the present."). A judge's impartiality in any case—and especially a case like this one that has been the subject of extensive media coverage[25]—cuts to the core of the public's trust in the justice system as a whole. The writ of mandamus stands by to "prevent[] injury to the public perception of the judicial system before it has a chance to occur." *United States v. Balistrieri*, 779 F.2d 1191, 1205 (7th Cir. 1985). Indeed, the recognized purpose of §455(a) is to address "systemic interests" regarding "concerns [about] the appearance of impropriety." *Fowler v. Butts*, 829 F.3d 788, 791 (7th Cir. 2016).

Even so, Labaton can show that it would suffer irreparable harm without this Court's writ. On the current path, the District Court will eventually decide, on the basis of *de novo* review, whether to adopt the Master's recommended remedies, as well as his findings that Labaton committed misconduct. Since the vast majority

---

[25]    *See, e.g.*, Jack Newsham, *Law Firms That Double-Billed for Staff Attys. Face $2M Probe*, LAW360 (Feb. 6, 2017); Brian Amaral, *Special Master to Probe $75M Fee Request in State St. Deal*, LAW360 (Mar. 7, 2017); Brian Amaral, *Judge Will Allow Class to Object to $75M State Street Fees*, LAW360 (Mar. 24, 2017).

of the Court's findings would involve questions of fact, or mixed questions of law and fact, the appellate court would not review those findings *de novo*.[26]  For example, an appellate court will only reverse the Court's findings if they are "clearly erroneous."  FRCP 52(a)(6); *Accusoft Corp. v. Palo*, 237 F.3d 31, 40 (1st Cir. 2001) ("we will not disturb the master's factual findings unless they are clearly erroneous").  Therefore, absent mandamus, Labaton may lose its chance to have a fair and complete *de novo* review of key portions of the Master's Report.

For all of these reasons, Labaton satisfies any requirement that it demonstrate irreparable harm if the requested writ of mandamus is denied.

## III.  The Balance of Equities Favors This Court's Issuance of a Writ Requiring the District Court's Recusal.

A number of factors specific to this case show the necessary "favorable balance of the equities" to justify issuance of the requested writ of mandamus.  *In re Vasquez-Botet*, 464 F.3d 54, 57 (1st Cir. 2006) (internal citation omitted); *In re Bulger*, 710 F.3d at 49 ("a mandamus petitioner must show . . . a balance of equities in his favor.").  Perhaps most importantly, Labaton merely seeks its opportunity to have a meaningful, *de novo* review of a critical Master's Report that Labaton, in good faith, contests.  Labaton is currently in a situation where that

---

[26]     Unlike other circuits, the First Circuit does not appear to have squarely addressed whether questions under § 455(a) may be raised on appeal from a final decision.  *See, e.g.*, *Fowler*, 829 F.3d at 791(surveying circuit law and observing that courts have differed on whether arguments under § 455(a) can be raised on direct appeal").  Labaton reserves all rights.

review will take place before the same judge who selected the Master, the same judge who approved the exorbitant costs (which Customer Class Counsel paid) for the Master to conduct the investigation and prepare the resulting report, and the same judge who learned about at least some contested, substantive issues through *ex parte* discussion with Labaton's *de facto* "adversary."  Granting this petition and requiring recusal would go a long way to ensure that Labaton gets its day in Court before a fair and impartial judge.  Denying this petition leaves Labaton to push through potentially protracted proceedings, all before a judge whose impartiality might reasonably be questioned.  The balance of equities in these circumstances tips squarely in favor of granting the petition.

## CONCLUSION

For the reasons set forth above, Labaton respectfully requests that the Court issue a writ of mandamus directing the Honorable Mark L. Wolf to vacate his order denying Labaton's motion for recusal, and recuse himself from this case.

Respectfully submitted,

LABATON SUCHAROW LLP

By its Attorneys

*/s/ Joan Lukey*
Joan A. Lukey
Justin J. Wolosz
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000
joan.lukey@choate.com
jwolosz@choate.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the attached Petition for Writ of Mandamus

with attachments has been sent on this day via email and overnight mail to the

following:

Richard M. Heimann, Esq.
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Brian T. Kelly, Esq.
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110-2131

William H. Paine, Esq.
WilmerHale
60 State Street
Boston, MA  02109

William Sinnott, Esq.
Barrett & Singal
One Beacon Street
Suite 1320
Boston, MA 02108-3106

Lynn Lincoln Sarko, Esq.
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

J. Brian McTigue, Esq.
McTigue Law LLP
4530 Wisconsin Ave. N.W.
Suite 300
Washington, DC  20016

Carl S. Kravitz, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807

Jonathan G. Axelrod, Esq.
Beins, Axelrod, P.C.
1030 15th Street, N.W.
Suite 700
Washington, DC 20005

I hereby certify that a copy of the attached Petition for Writ of Mandamus

with attachments has been sent on this day via mail to the following:

- Courtroom Clerk to the Honorable Mark. L. Wolf, Christine Bono, John Joseph Moakley United States Courthouse, 1 Courthouse Way, Boston MA 02110.

Signed this 6th day of July, 2018

*/s/ Joan Lukey*
Joan A. Lukey

- 33 -

**Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. This document complies with the word limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f):

    ☐ this document contains 7456 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    ☐ this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font.

*(s) Joan Lukey*

Attorney for Labaton Sucharow, LLP

Dated: July 6, 2018

## TABLE OF CONTENTS

| Document | Addendum Page No. |
|---|---|
| Memorandum and Order on Motion for Recusal | ADD 1 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br>     Plaintiff <br><br>         v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) C.A. No. 11-10230-MLW <br> ) <br> ) <br> ) <br> ) |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN,WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br>     Plaintiff <br><br>         v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 11-12049-MLW <br> ) <br> ) <br> ) |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND and all others similarly situated, <br>     Plaintiff <br><br>         v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 12-11698-MLW <br> ) <br> ) <br> ) |

<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                            June 28, 2018

    On June 21, 2018, I issued an Order stating that, "[f]or the reasons that will be explained in a forthcoming Memorandum and Order, Labaton Sucharow, LLP's motion seeking my recusal pursuant

1

to 28 U.S.C. §455(a) is hereby DENIED because a reasonable person could not question my impartiality." Docket No. 315. The reasons for that decision are described in this Memorandum.[1]

I. SUMMARY

I have been presiding in this class action since 2011. In 2016, I approved a settlement of the case and awarded Lead Counsel Labaton Sucharow LLP ("Labaton") and other law firms that represented the class $75,000,000 in attorneys' fees. A subsequent letter from Labaton informed me of what were characterized as "inadvertent errors" in the fee petition and affidavits Labaton had filed. A Boston Globe article raised further questions about the reliability of the representations that were made in the fee petition.

In 2017, with the agreement of Labaton and the other law firms representing the class, I took the evidently then unprecedented step of appointing a Master to investigate whether false and misleading statements had been made in the petition for fees and related issues. I directed the Master, Retired United

---

[1] I issued the Order in advance of this Memorandum because I wanted to eliminate any doubt about my authority to conduct the previously scheduled June 22, 2018 hearing on proposed redactions to the Master's Report and Recommendation. This also provided the proper sequence for deciding whether to make public some information Labaton had requested remain sealed that is necessary to discuss in this Memorandum. In view of the tight time frame for deciding the underlying questions of redaction, I also needed more time to complete drafting this Memorandum.

2

States District Judge Gerald Rosen, to report the results of his investigation and to make recommendations concerning whether the fee award should be reduced and whether sanctions should be imposed on any of the attorneys.

In May 2018, the Master submitted his Report and Recommendation (the "Report") under seal to permit the law firms to propose redactions.[2] The Master has recommended, among other things, that Labaton and some of the firms associated with it be ordered to disgorge more than $10,000,000. The Master also found that Garrett Bradley of the Thornton Law Firm ("Thornton"), and of Counsel to Labaton, included statements that he knew were false in his affidavit in support of the fee petition. The Master recommends that I find Garrett Bradley violated Federal Rule of Civil Procedure 11, impose a sanction on Thornton of $400,000 to $1,000,000, and refer Garrett Bradley to the Massachusetts Board of Bar Overseers for disciplinary action.

The law firms have an opportunity to object to the Master's findings and recommendations. The presiding judge must decide any objections de novo. As Labaton wrote in requesting my recusal, the decisions on objections could have "serious and far reaching adverse ramifications for at least some of the law firms." Docket No. 216-1 at 2.

---

[2] On June 28, 2018, the Report was ordered unsealed, with limited redactions not referenced in this Memorandum. See Docket No. 357.

Labaton has filed a motion asserting that the Master's appointment should be deemed concluded. That motion is not yet fully briefed and remains to be decided. However, if it is granted the Master would not have the opportunity to respond to objections to his recommendations.

Labaton has also moved for my disqualification pursuant to 28 U.S.C. §455(a). Labaton's motion relies primarily on a colloquy at sidebar during a May 30, 2018 hearing that included questioning of George Hopkins, the Executive Director of class representative Arkansas Teacher Retirement System ("ATRS").

In a class action, the presiding judge has a duty to assure that the class is represented by an entity or individual whose interests are typical of those of the members of the class and who will vigorously advocate the interests of the class through qualified counsel. This means, among other things, that the presiding judge should examine the adequacy of representation at all stages of the litigation, particularly if there has been a material change in circumstances. My questioning of Hopkins in open court was intended to obtain information relevant to determining whether ATRS continues to be an adequate representative of the class.

My questions to Hopkins were based, in meaningful measure, on a concern that ATRS' long and continuing relationship with Labaton might keep it from vigorously advocating the interests of

4

the class concerning whether Labaton and other firms should be ordered to disgorge more than $7,400,000 for the benefit of the class, and whether Labaton should be required to disgorge an additional $4,100,000 as well. The Master's Report revealed that $4,100,000 of the $75,000,000 fee award had been paid to Damon Chargois, a lawyer in Texas who had done no work on the case, and whose name was not disclosed to ATRS, the class, or the court. That payment reportedly resulted from the efforts of Chargois and his partner in Arkansas, Tim Herron, in introducing Labaton to ATRS. Chargois described that role in a message to Labaton, stating:

> We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period.

Report (Docket No. 224) at 125 n.111.

Hopkins stated to the Master that he did not believe that the fee to Chargois should have been disclosed to ATRS or the class. This prompted the Master to write that, "[w]e cannot see how, in light of a clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately represent the class moving forward." Id. at 258, n.207.

5

ADD 5

While the merits of the Master's views remain to be decided, on May 30, 2018 I anticipated that the conduct of Hopkins on behalf of ATRS would become an issue in these proceedings, and that ATRS' interests might be aligned with Labaton's interests, which now conflict with the financial interests of the class. In addition, the Boston Globe had investigated and reported on campaign contributions to a Massachusetts county treasurer and the state treasurer by Labaton and Thornton before receiving lucrative contracts to represent funds chaired by those officials in class actions. It also reported that federal prosecutors were investigating Thornton's political campaign contributions. The Master in seeking instruction had told me that federal prosecutors were investigating whether Thornton had made an illegal payment to a pension fund official and asked him to provide information obtained in his investigation.[3] The Boston Globe article and the criminal investigation caused me to expect that there would be questions by the media at least about the origins of Labaton's relationship with ATRS when the Master's Report was unsealed. Each of these matters is relevant to whether ATRS remains a typical and adequate class representative.

In response to my questions on May 30, 2018, Hopkins testified that he did not believe that ATRS should take a position

---

[3] I instructed the Master not to provide information to the prosecutors voluntarily.

on whether Labaton and other lawyers should be ordered to return some of the fees awarded to the class. He also said ATRS was not, as class representative, receiving legal advice from anyone other than Labaton.

Without being asked, Hopkins also stated that, when he became Executive Director of ATRS, Labaton was one of several firms retained to monitor ATRS' investments and possibly represent ATRS in class actions, and that "political leaders" had persuaded Hopkins to give high priority to such cases. In response to questions about this, Hopkins said that he had over the years discussed class actions, Labaton, and this case with Stephen Faris. According to Master's Report, Faris, as an Arkansas State Senator, had introduced Labaton to ATRS. Hopkins also testified that he had met with Faris on May 28, 2018 -- Memorial Day -- and discussed the May 30, 2018 hearing with him.

After questioning Hopkins, I summarized my concerns about whether ATRS remained a typical and adequate class representative. I noted that the Master's Report raised questions, which were only questions, about the origins of Labaton's relationship with ATRS, and expressed concern that such an issue might diminish ATRS' incentive to represent the class vigorously. I concluded by saying that my paramount responsibility is to assure that the class is represented by a lead plaintiff whose role is not complicated by unique issues and potential conflicts of interest.

7

I provided Hopkins a week to report on whether ATRS wished to continue as a class representative and, if so, whether it intended to continue to get advice from Labaton or to obtain new counsel.

Counsel for Labaton then requested a sidebar conference, which was not public. I explained the reasons for my questions to Hopkins about Chargois and Faris. I said that while they may not be questions to be resolved in this case, I believed it was foreseeable that when the Report became public, there would be questions about the origins of the relationship between Labaton and ATRS, and whether "all of those millions of dollars stopped with Mr. Chargois." May 30, 2018 Tr. at 2. I expressed concern that such questions could affect ATRS' adequacy as class representative. In response to questions from Labaton's counsel, I stated that I had not formed the opinion that money was going to Faris or anyone else, or that public corruption had occurred. I reiterated that I was concerned that when the Report was made public ATRS would become part of the controversy, and that caused me to question whether ATRS remained an appropriate representative of the class. I said: "[R]emember what this is about. Who is representing the class?" Id. at 8.

Labaton has moved for my disqualification based primarily on the colloquy at sidebar. Labaton does not contend that I am actually biased or prejudiced, or claim that I actually have personal -- meaning extrajudicial -- knowledge of any disputed

8

evidentiary fact. Therefore, it does not seek my disqualification pursuant to 28 U.S.C. §455(b)(1).

Instead, Labaton suggests that a reasonable person could believe I am biased or prejudiced, or that I have personal knowledge of disputed facts. Therefore, Labaton seeks my recusal pursuant to 28 U.S.C. §455(a), which requires disqualification if the judge's impartiality might reasonably be questioned.

As the First Circuit has written, §455(a) "seeks to balance two competing policy considerations: first, that courts must not only be, but seem to be, free of bias or prejudice; and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." In re: Boston's Children First, 244 F.3d 164, 167 (1st Cir. 2001) (internal citations and quotations omitted).

A motion for disqualification under §455(a) must be decided from the perspective of a fully informed, reasonable person. "[U]nder §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." Liteky v. United States, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring in judgment); United States v. Snyder, 235 F.3d 42, 48 (1st Cir. 2000) (quoting Liteky); In re United States, 158 F.3d 26, 34 (1st Cir. 1998) (same).

9

Almost always, an extrajudicial source is required to justify recusal under §455(a).  See Liteky, 510 U.S. at 551. An extra-judicial source typically involves ex parte communications in which "a judge receives information that does not enter the record, the reliability of [which] may not be tested through the adversary process." United States v. Craven, 239 F.3d 91, 103 (1st Cir. 2001). As I explained would occur at the March 7, 2017 hearing at which the Master was appointed, I had periodic ex parte communications with the Master to discharge my administrative duties, under Federal Rule of Civil Procedure 53(a)(3), to protect against unreasonable expense and delay in these proceedings.  In that process I was told about the existence of the $4,100,000 payment to a lawyer who did not work on this case.  This information was provided to me so I could determine whether to authorize the Master to retain an advisor on the ethical issues that payment raised and decide whether to grant extensions of the deadline for submission of the Master's Report.  I did not discuss with the Master the substance or merits of the ethical issues, which are addressed at length in his 377-page Report, or the substance or merits of any other issues.

As indicated earlier, the Master also informed me that federal prosecutors in Massachusetts had asked him for information in connection with their investigation of Thornton. He did so to seek instruction on how to respond to the request.  I directed

10

the Master to tell the prosecutors that he was not authorized to provide them documents or information; rather, if they wanted to pursue the matter, they would have to file a motion to be decided by me or issue a grand jury subpoena. The prosecutors have done neither.

For the reasons described in detail in this Memorandum, a fully informed, reasonable person could not question my impartiality. Therefore, my recusal under §455(a) is not justified. Accordingly, I have a duty to continue to preside in this case, in part to avoid encouraging the perception that litigants can manipulate the system to jettison an impartial judge in the hope of getting another more to their liking. See In re: Allied Signal, 891 F.2d 967, 970 (1st Cir. 1989) (Breyer, J.). Therefore, on June 21, 2018 I issued an order denying Labaton's motion for my recusal.

## II. THE MOTION AND THE APPLICABLE STANDARDS

Labaton filed a motion asking me to decide whether my disqualification is mandated by §455(a), which requires recusal if in this case my "impartiality might reasonably be questioned."[4] Labaton did not contend that I am actually biased or prejudiced,

---

[4] No other law firm joined Labaton's motion seeking my recusal. Labaton did not request discovery concerning its motion. Nor did Labaton request a hearing on it as required by Rule 7.1(d) of the Local Rules of the United States District Court for the District of Massachusetts if a party "wishes to be heard." I found, in any event, that a hearing on the motion was not necessary.

11

or that I have personal, meaning extrajudicial, knowledge of disputed evidentiary facts, any of which would require my recusal under 28 U.S.C. 455(b)(1). Nevertheless, Labaton suggested that I decide whether a reasonable person might question my impartiality. See In re Bulger, 710 F.3d 42, 46 (1st Cir. 2013) (in some circumstances, "a reasonable person may question impartiality without the presence of any evidence the judge is subjectively biased").

Labaton stated that its motion was primarily based on the colloquy at sidebar following my questioning George Hopkins, the Executive Director of ATRS. See Docket Nos. 275 at 2, 276 at 2. It wrote that the motion "secondarily relate[d]" to whether the court's impartiality could reasonably be questioned concerning challenges Labaton intended to make to the cost and the performance of the Master. Docket No. 275 at 2; see also Docket No. 276 at 1. On June 19, 2018, Labaton has filed a motion seeking, among other things, a ruling that the Master's role in this case has ended. See Docket No. 302.

It is the duty of the presiding judge, rather than another judge, to decide whether his disqualification is required by §455(a). See In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997). As the First Circuit has explained:

> It might seem odd that recusal issues should
> be decided by the very judge whose recusal is
> in question. But there are other

12

considerations at work, including desire for expedition and a concern to discourage judge shopping.

Id.

In 1989, then-Judge Stephen Breyer wrote with regard to a motion to disqualify under §455(a) that:

> We draw our legal standards for review of a district judge's decision not to disqualify himself from [] In re United States, 666 F.2d [690]. We there held (1) that "a charge of partiality must be supported by a factual basis," (2) that "disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality," and (3) that this court of appeals will allow the district judge "a range of discretion" in making these determinations. Id. at 695 (emphasis in original). Only if the district court's decision to sit "cannot be defended as a rational conclusion supported by reasonable reading of the record" will we insist upon disqualification. Id. (emphasis added).

In re Allied-Signal, 891 F.2d 967, 970 (1st Cir. 1989) (emphasis in original).

The standard for determining a motion for disqualification under §455(a) is "[w]hether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. §455, but rather in the mind of the reasonable man." United States v. Voccola, 99 F.3d 37, 42 (1st Cir.

13

1996) (quoting <u>United States v. Cowden</u>, 545 F.2d 257, 265 (1st Cir. 1976)). Therefore, the disqualification issues must be analyzed from the perspective of "an objective, knowledgeable member of the public," rather than from the perspective of a person involved in, or directly affected by, the case. <u>El Fenix de Puerto Rico v. M/Y JOHANNY</u>, 36 F.3d 136, 141 (1st Cir. 1994) (quoting <u>In re United States</u>, 666 F.2d at 695)).

This test asks "whether a reasonable person, <u>fully informed of all the facts</u>, would doubt [the judge's] impartiality." <u>In re United States</u>, 158 F.3d at 31 (emphasis added); <u>see also United States v. Vazquez-Botet</u>, 532 F.3d 37, 48 (1st Cir. 2008); <u>El Fenix de Puerto Rico</u>, 36 F.3d at 141; <u>Home Placement Serv., Inc. v. Providence Journal Co.</u>, 739 F.2d 671, 676 (1st Cir. 1984). The proper perspective has been described as that of "the reasonable man on the street ... who knows the full facts even if those facts are not known on the street." <u>Ricci v. Key Bancshares of Maine, Inc.</u>, 111 F.R.D. 369, 374 (D. Me. 1986) (Aldrich, J., sitting by designation).

The conduct that has prompted the motion for recusal is not to be considered in isolation. Rather, the record as a whole must be considered. <u>See In re Cargill, Inc.</u>, 66 F.3d 1256, 1260 (1st Cir. 1995) (reviewing recusal in light of "careful perscrutation of the record"); <u>In re Allied-Signal</u>, 891 F.2d at 972 (considering that law clerks whose brothers were plaintiffs' counsel had worked

14

on the complex case since it began and were unusually useful "in bringing Phase One [of the case] to trial"); cf. United States v. Ayala-Vazquez, 751 F.3d 1, 23 (1st Cir. 2014) ("[W]hen a defendant claims he has been prejudiced through a trial judge's interventions at trial, '[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole[.]'") (quoting United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1998))).

In deciding a motion to recuse under §455(a), "the district court is not to use the standard of 'Caesar's wife,' the standard of mere suspicion." In re Allied-Signal, 891 F.2d at 970; see also In re Bulger, 710 F.3d at 47 (same); Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260, 1271 (1st Cir. 1996) (same). Rather, as Justice Anthony Kennedy has written, and the First Circuit has reiterated:

> [Section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

15

Liteky, 510 U.S. at 557-58,   (Kennedy, J., concurring in the judgment) (emphasis added); see also Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58); In re United States, 158 F.3d at 34 (same). In essence, "the presumption is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath." In re Aguinda, 241 F.3d 194, 204 (2d Cir. 2001).[5] However, the First Circuit has explained that "doubts ordinarily should be resolved in favor of recusal." In re United States, 158 F.3d at 30.

In Liteky, the Supreme Court wrote that for the purpose of §455(a) analysis:

> [I]t may not be too far off the mark as a practical matter, to suggest that "extrajudicial source" is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one . . . .

510 U.S. at 551 (emphasis in original). A disqualifying appearance of bias or prejudice under §455(a) can be based on information the judge acquires in the litigation, but only if "it is so extreme as to display clear inability to render fair judgment." Id.

The "high threshold" required for recusal under §455(a) recognizes certain realities. In re United States,

---

[5] See also First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler, 210 F.3d 983, 988 (9th Cir. 2000) ("[J]udges are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety.").

16

ADD 16

158 F.3d at 34 (quoting Liteky, 510 U.S. at 557-58). As the First Circuit has explained, "[i]n the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns . . . . [C]ourts cannot afford to spawn a public perception that lawyers and litigants will benefit by undertaking such machinations." In re Cargill, 66 F.3d at 1262-63. Therefore, again, as then-Judge Breyer wrote:

> [W]hen considering disqualification, the district court is not to use the standard of Caesar's wife, the standard of mere suspicion. This is because "the disqualification decision must reflect not only the need to secure public confidence through proceedings that appear to be impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

In re Allied-Signal, 891 F.2d at 967; see also In re Bulger, 710 F.3d at 47; In re United States, 441 F.3d 44, 67 (1st Cir. 2006) (same); Cigna Fire Underwriters Co., 86 F.3d at 1270 (same). This is because §455(a) "seeks to balance two competing concerns: first, the courts must not only be, but seem to be, free of bias and prejudice, and second the fear that recusal on demand would provide litigants with a veto against judges." In re: Boston's Children First, 244 F.3d at 167 (internal citations and quotations omitted).

17

In addition, because "litigants have an incentive to judge-shop, [ ] a judge should not grant a recusal motion simply because a claim of partiality has been given wide-spread publicity." <u>In re Aguinda</u>, 241 F.3d at 206; <u>see also</u> <u>In re Drexel Burnham Lambert, Inc.</u>, 861 F.2d 1307, 1309 (2d Cir. 1988). Because it is important not to allow, or appear to allow:

> litigants or third parties [the power] to exercise a negative veto over the assignment of judges ... [the] inquiry cannot stop with the questions [such as] . . . would the judge have avoided controversy and the need for appellate review if he had stepped aside?

<u>In re United States</u>, 666 F.2d at 694-95.

Moreover, §455(a) "should not be used by judges to avoid sitting on difficult or controversial cases." <u>Snyder</u>, 235 F.3d at 45 (quoting H.R. Rep. No. 1453, 93d Cong., 2d Sess., 1974 U.S. Code Congr. & Admin. News 6351, 6355); <u>see also</u> <u>United States v. Salemme</u>, 164 F. Supp. 2d 86, 94 (D. Mass. 1998).[6]

---

[6] Where, as here, the only basis for a motion for disqualification is §455(a), the parties agree that the judge is actually impartial and the only issue is one of perception. Therefore, after full disclosure of the facts by the judge, on the record, the parties are permitted to waive a §455(a) ground for recusal under 28 U.S.C. §455(e), but not a ground under §455(b), which addresses actual impediments to the judge's ability to preside impartially. See, e.g., In re Cargill, 66 F.3d at 1261 ("The relevant statute, 28 U.S.C. §455(e), plainly contemplates that a party may waive an appearance-of-impropriety ground for disqualification."); Salemme, 164 F. Supp. 2d at 93-94. Such waivers permit a case to proceed without interruption or delay.

Case: 18-1651    Document: 00117312789    Page: 60    Date Filed: 07/10/2018    Entry ID: 6183111

Case 1:11-cv-10230-MLW   Document 358   Filed 06/28/18   Page 19 of 72

III. THE RELEVANT FACTS

A fully informed, reasonable person would know the following facts.

A.   The Appointment of the Master

After a hearing on November 2, 2016, I approved a $300,000,000 settlement in this class action alleging that defendant State Street Bank overcharged its customers in connection with certain foreign exchange transactions. I employed the "common fund" method to determine the amount of attorneys' fees to award, meaning that I "shape[d] the counsel fee based on what [I] determined [was] a reasonable percentage of the fund recovered for [the class]." In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995). I found to be reasonable a requested award to class counsel of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses. That award represented about 25% of the common fund.

Like many judges, and consistent with my longstanding practice, I tested the reasonableness of the requested award, in part, by measuring it against what the nine law firms representing plaintiffs stated was their total "lodestar" of $41,323,895.75. See Nov. 2, 2016 Transcript ("Tr.") at 30-31, 34; see also Manual for Complex Litigation (Fourth) §14.122 (2004) ("the lodestar is ... useful as a cross-check on the percentage method" of determining reasonable attorneys'

19

fees); Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002)("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Plaintiffs' counsel represented that the total requested award involved a multiplier of 1.8 of their lodestar, which they argued was reasonable in view of the risk they undertook in taking this case on a contingent fee. See Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees (Docket No. 103-1) at 24-25 (the "Fees Award Memo").

A lodestar is properly calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See Blum v. Stenson, 465 U.S. 886, 889, 891 (1984). The Supreme Court has instructed that "[r]easonable fees ... are to be calculated according to the prevailing rates in the relevant community." Id. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicum of market value." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 40 (1st Cir. 2008) (emphasis added). The First Circuit cited a common fund case, In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992), for this proposition. Id.

In the memorandum in support of the fee request, Labaton represented that to calculate the lodestar counsel had used "current rather than historical billing rates," for attorneys

20

ADD 20

working on this case. Fees Award Memo. at 24. Similarly, in the related affidavits filed on behalf of each law firm counsel stated that "the hourly rates for the attorneys and professional support staff in my firm ... are the same as my firm's regular rates charged for their services...." For example, Garett Bradley made this statement under oath in his affidavit on behalf of Thornton. See Docket No. 104-16 at ¶4. Lawrence Sucharow made the same statement under oath in his affidavit on behalf of Labaton. See Docket No. 104-15 at ¶7. The affidavits on behalf of each law firm, including Bradley's for Thornton, stated that the calculations were based on contemporaneous time records, which were available to be reviewed by me. See Bradley Aff. (Docket No. 104-16) at ¶3. In view of the well-established jurisprudence and the representations of counsel, I understood that in calculating the lodestar plaintiffs' law firms had used the rates they each customarily actually charged paying clients for the services of each attorney, and were representing that those rates were comparable to the rates actually charged by other attorneys to their clients for similar services in their community.

On November 10, 2016, David J. Goldsmith of Labaton, on behalf of plaintiffs' counsel, sent me a letter. See Docket No. 116. Goldsmith noted that I had used the lodestar calculated by counsel as a check concerning the reasonableness of the percentage of the common fund requested for attorneys' fees. Id. at 3, n.4. He stated

21

that as a result of an "inquiry from the media" "inadvertent errors
[had] just been discovered in certain written submissions from
Labaton Sucharow LLP, Thornton, and Lieff Cabraser Heiman &
Bernstein LLP supporting Lead Counsel's motion for attorneys'
fees...." Id. at 1. Goldsmith reported that the hours of certain
staff attorneys, who were paid by the hour primarily to review
documents, had been included in the lodestar reports of more than
one firm. Id. at 1-2. More specifically, the letter stated that
lawyers located at Labaton's and Lieff's offices were counted by
Thornton and should have been included only in Thornton's lodestar.
Id. at 2. Goldsmith also wrote that in some cases different billing
rates had been attributed to particular staff attorneys by
different firms. Id. at 3.

This double-counting resulted in inflating the number of
hours worked by more than 9,300 and inflating the total lodestar
by more than $4,000,000. Id. at 2-3. As a result, Goldsmith stated
a multiplier of 2, rather than 1.8, should have been used to test
the reasonableness of the request for an award of $74,541,250 in
attorneys' fees. Id. at 3. He asserted that the award nevertheless
remained reasonable and should not be reduced. Id.

The letter did not indicate that the reported lodestar was
not based on what plaintiffs' counsel, or others in their
community, actually customarily charged paying clients for the
type of work done by the staff attorneys in this case. Nor did the

22

letter raise any question concerning the reliability of the representations concerning the number of hours each attorney reportedly worked on this case.

Such questions, among others, were raised by a December 17, 2016 Boston Globe article headlined "Critics hit law firms' bills after class action lawsuits." See Docket No. 117, Ex. B. For example, the article reported that the staff attorneys involved in this case were typically paid $25-$40 an hour. In calculating the lodestar, it was represented to the court that the regular hourly billing rates for the staff attorneys were much higher—for example, $425 for Thornton, see Docket No. 104-15 at 7-8 of 14, and $325-440 for Labaton, see Docket No. 104-15 at 7-8 of 52. A representative of Labaton reportedly confirmed the accuracy of the article in this respect. See Docket No. 117, Ex. B at 3.

The Boston Globe also published a January 28, 2017 article headlined "Firms profit from Garret Bradley's ties," which is relevant to the Labaton's request for my recusal. The article stated that the Plymouth County Treasurer Thomas J. O'Brien was:

> an unlikely magnet for campaign contributions from high powered attorneys in Manhattan and downtown Boston. Yet, since 2007, lawyers from the Thornton Law Firm in Boston and Labaton Sucharow have given $100,000 to O'Brien's political campaigns, accounting for almost half of all of the contributions he's received over the decade.

23

ADD 23

Andrea Estes, "Firms profited from Garrett Bradley's ties," <u>Boston
Globe</u> (Jan. 28, 2017).[7] The article further reported that,
"[f]ourteen times in the past decade, the Plymouth County
retirement system has filed [class action] lawsuits on the advice
of lawyers from Labaton and Thornton." <u>Id.</u> Reportedly, "[c]ourt
records show that the retirement fund has collected a grand total
of $40,035 from all lawsuits combined while the lawyers had
received 1,000 times that amount: $41.4 million." <u>Id.</u>

The article also states that "in Massachusetts, no one is
better at persuading investors to join class action lawsuits than
O'Brien's friend, [Garrett] Bradley, the managing partner of the
Thornton Law Firm and, until his sudden departure a few months
ago, assistant majority leader in the state House of
Representatives." <u>Id.</u> Thornton's lawyer explained that Bradley's
role was to "drum up business," for Thornton and Labaton.  <u>Id.</u>
"O'Brien said his county's decision to join so many Labaton
lawsuits has nothing to do with <u>political</u> <u>favors</u>." <u>Id.</u> (emphasis
added).[8]

---

[7] The <u>Boston Globe</u> article is not cited for the truth of the
statements in it. It is quoted because the information it contains
is relevant to what a fully informed person would know, and to
whether the statements in the sidebar conference on May 30, 2018
on which Labaton primarily relies in seeking my recusal could cause
a knowledgeable, reasonable person to doubt my impartiality.

[8] The Master's Report at 125, n.111, states that Chargois, the
attorney in Texas who received more than $4,000,000 of the

The January 28, 2017 Boston Globe article also raised questions about more than $30,000 in campaign contributions Thornton and Labaton made to Massachusetts Treasurer Timothy Cahill. Reportedly, several months after those contributions, the state pension fund Cahill chaired hired Labaton. Andrea Estes, "Firms profited from Garrett Bradley's ties," Boston Globe (Jan. 28, 2017). Labaton reportedly subsequently filed two successful class action lawsuits for the pension fund. Id. As a result, Labaton reportedly received $60,000,000, and shared $9,000,000 with Thornton, while the pension fund collected $681,763. Id. The article also reported that after the Boston Globe began asking questions about Bradley's work with the pension fund, "he took the drastic step [of] . . . abruptly resign[ing] from the state Legislature . . . ." Id.[9]

---

attorneys' fees I awarded although he did no work on this case, wrote in a 2014 email to Labaton that:

> Our deal with Labaton is straightforward. We got you ATRS after considerable favors, political activity, money spent and time dedicated in Arkansas and Labaton would use ATRS to seek lead counsel appointments in institutional fraud and misrepresentation cases. When Labaton is successful in getting a settlement or judgment award, we split Labaton's attorney fee award 80/20 period.

[9] The Boston Globe subsequently published another article that reiterated and amplified its report concerning Thornton and Labaton campaign contributions to Plymouth County Treasurer O'Brien and Massachusetts Treasurer Cahill before being hired to conduct class action litigation that was lucrative for the lawyers.

25

In addition, the January 28, 2017 <u>Boston Globe</u> article stated that:

> Bradley and his Thornton colleagues are now facing a federal criminal investigation into their firm's massive political donations program. The US attorney wants to know whether the law firm illegally reimbursed the firm's attorneys for donations, including those to politicians who oversee pension funds.

<u>Id.</u>

In a February, 2017 Memorandum and Order, I wrote that the December 17, 2016 <u>Boston Globe</u> article raised questions concerning whether the hourly rates plaintiffs' counsel attributed to the staff attorneys in calculating the lodestar were, as represented, what these firms actually charged for their services or what other lawyers in their community charge paying clients for similar services. Docket No. 117. This concern was enhanced by the fact that different firms represented that they customarily charged clients for the same lawyer at different rates. In general, I questioned whether paying clients customarily agreed to pay, and actually paid, an hourly rate for staff attorneys that is about

---

<u>See</u> Andrea Estes, "Former top Mass. lawmaker often helped his business, family," <u>Boston Globe</u> (May 30, 2017). That article stated that "[a] federal grand jury is now looking into millions of dollars in reimbursements for campaign contributions, which may violate laws that require political donations be made in the name of the actual donors." <u>Id.</u>

ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs.

In addition, I noted that the article raised questions concerning whether the hours reportedly worked by plaintiffs' attorneys were actually worked. Id. Most prominently, the article accurately stated that Michael Bradley, the brother of Thornton Managing Partner Garrett Bradley, was represented to me to be a staff attorney employed by Thornton who worked 406.40 hours on this case. See Docket No. 104-15 at 7. Garrett Bradley also represented that the regular rate Thornton charged for his brother's services was $500 an hour. Id. However the article stated, without reported contradiction, that "Michael Bradley ... normally works alone, often making $53 an hour as a court appointed defender in [the] Quincy [Massachusetts] District Court." Docket No. 117, Ex. B. These statements caused me to express concern about whether Michael Bradley actually worked more than 400 hours on this case and about whether Thornton actually regularly charged paying clients $500 an hour for his services.

I also stated that the acknowledged double-counting of hours of staff attorneys and the matters discussed in the December 17, 2016 Boston Globe article raised broader questions about the accuracy and reliability of the representations plaintiffs' counsel made in their calculation of the lodestar generally. These questions -- which I said were only questions -- caused me to

27

express concern about whether the award of almost $75,000,000 in attorneys' fees was reasonable.  Therefore, I informed the parties that I proposed to appoint Retired United States District Judge Gerald Rosen as a Master to investigate and provide a Report and Recommendation on all issues relating to the award of attorneys' fees in this case.

On March 7, 2017, pursuant to the February 6, 2018 Order, I held a hearing concerning my proposed appointment of Judge Rosen as Master and related issues.  The hearing began with argument concerning the motion filed by Ted Frank of the Competitive Enterprise Institute to participate in these proceedings, including as a guardian ad litem for the class with the authority to serve as an adversary to the plaintiffs' law firms in any proceedings before the proposed Master.  In successfully opposing this request, counsel for Labaton, Joan Lukey, argued that Judge Rosen could retain someone "to ask cross-examination questions in an adversarial or quasi-adversarial model," and, therefore, neither the class nor the Master would need Frank's assistance. Mar. 7, 2017 Tr. at 40.  Lukey added that Judge Rosen was "obviously very skilled and has been in the role of a judge for many, many years." Id.  She expressed appreciation for "the opportunity to present to a special master of his qualifications." Id. at 41. Therefore, Labaton had "no objection to Judge Rosen" being

28

appointed as Master.  Id. at 41, 43.  Nor did anyone else object
to Judge Rosen's appointment.  Id.

Labaton also agreed to my proposal that it return $2,000,000
to the District Court so that I could review bills and authorize
payment of the reasonable cost of the Master and those he employed.
Id. at 44, 65.  I told the law firms that if more than $2,000,000
was needed, I would give notice and provide an opportunity for
them to be heard concerning where the funds should come from.  Id.
at 65.

Federal Rule of Civil Procedure 53(a)(3) provides, in part,
that in appointing a master the court must "protect against
unreasonable expenses or delay."  Therefore, on March 7, 2017, I
informed the parties that "I [would] monitor who is being employed
[by the Master] and what the proposed rates are."  Id.

I also told the parties that I anticipated that it would be
necessary for me to have some ex parte communications with the
Master.  Id. at 68.  I explained, however, that:

> I want to minimize any ex parte communications
> with me because I'll need to decide objections
> to [the Master's] report and recommendation.
> So, I intend to limit ex parte communications
> to what I call administrative matters at this
> point, fee requests or procedural matters, if
> there are any.

Federal Rule of Civil Procedure 53(b)(2)(B) requires that an order
appointing a master state "the circumstances, if any, in which the
master may communicate ex parte with the court or a party."

29

Therefore, my Order appointing the Master addressed this issue,
stating, in pertinent part, that:

> The Master may communicate _ex parte_ with the
> court on administrative matters.  The Master
> may also, _ex parte_, request permission to
> communicate with the court _ex parte_ on
> particular substantive matters.  Requests for
> _ex parte_ communications with the court on
> substantive matters should be minimized.  _See_
> Fed. R. Civ. P. 53(b)(2)(B).

Docket No. 173, ¶6.  As explained below, my _ex parte_ communications
with the Master have involved only administrative matters.

The March 7, 2017 hearing also included discussion of some of
the issues that prompted the appointment of the Master.  Counsel
for Thornton, Brian Kelly, stated that my concerns about the
representations that had been made in the requests for attorneys'
fees were "justifiable."  Mar. 7, 2017 Tr. at 71.  He represented
that Michael Bradley had actually worked more than the number of
hours attributed to him in the fee petition, but did not have
conventional time sheets to document his time.  _Id._ at 72.  Kelly
and Michael Bradley each also stated that Michael Bradley was not
an employee of Thornton, and that neither the firm nor Michael
Bradley had, as represented under oath in Garrett Bradley's
affidavit in support of the fee petition, ever billed for his time
at the rate of $500 per hour.  _Id._ at 73-74.  Although he claimed
that Thornton's regular rate for Michael Bradley was $500 an hour,
Garrett Bradley could not identify any case in which a client had

been charged that rate, and identified only one Thornton case in which his brother was billed at a rate of as much as $300 an hour. Id. at 88-90.

As indicated earlier, Sucharow of Labaton had stated in his sworn affidavit in support of the request for attorneys' fees that: "[t]he hourly rates for attorneys and professionals in [Labaton], included in Exhibit A [to my affidavit] are the same as my firm's regular rates charged for their services which have been accepted in other complex class actions." Sucharow Aff. (Docket No. 104-15), ¶7; Mar. 7, 2017 Tr. at 79. At the March 7, 2017 hearing, however, Sucharow acknowledged that the rates characterized as Labaton's "regular rates charged for [the] services" of the attorneys who worked on this case had never been charged to paying clients because his firm always worked on a contingency fee basis and had no "billable clients." Mar. 7, 2017 Tr. at 79.

Similarly, Garrett Bradley acknowledged that Thornton had never billed a paying client $425 an hour for a staff attorney and, indeed, the staff attorneys he had represented in his affidavit worked for Thornton actually worked at, and were paid by, Labaton and Lieff. Id. at 88.

Although I did not say so at the time, the statements of Sucharow and Garrett Bradley heightened my concern about whether false and misleading statements had been made under oath.

31

I did, however, note at the March 7, 2017 hearing that the
propriety of the hourly rates attributed to "staff" and "contract"
attorneys for the purpose of calculating lodestars for use in class
actions had become the subject of litigation recently in several
cases in the Southern District of New York and mentioned several
of them. Mar. 7, 2017 Tr. at 94; In re Weatherford Int'l Sec.
Litig., 2015 WL 127847, at *1 (S.D.N.Y. 2015); In re Citigroup
Inc. Sec. Litig., 965 F. Supp. 2d 369 (S.D.N.Y. 2013); In re
Citigroup Inc. Bond Litig., 988 F. Supp. 2d 371 (S.D.N.Y. 2013);
In re Beacon Assocs. Litig., 2013 WL 2450960 (S.D.N.Y. 2013); City
of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp., 954
F. Supp. 2d 276 (S.D.N.Y. 2013). In one case, which involved a
firm involved in the instant case, Keller, Rohrbach, the court
wrote:

> There is little excuse in this day and age
> for delegating document review (particularly
> primary review or first pass review) to anyone
> other than extremely low-cost, low-overhead
> temporary employees (read, contract
> attorneys) – and there is absolutely no excuse
> for paying those temporary, low-overhead
> employees $40 or $50 an hour and then marking
> up their pay ten times for billing purposes.

Beacon Assocs., 2013 WL 2450960, at *18.

The lodestars and requested fee awards were reduced in some
of the cases in the Southern District of New York. See, e.g., In
re Weatherford Int'l Sec. Litig., 2015 WL 127847, at *2; In re
Citigroup Inc. Sec. Litig., 965 F. Supp. 2d at 373-74. However,

32

none of those cases resulted in the appointment of a master to investigate the veracity of the fee applications and related matters, including possible sanctions. I am evidently the first judge to have done that.

B.    Communications After the Appointment of the Master

As discussed at the March 7, 2017 hearing and authorized by the March 8, 2017 Order appointing the Master, I had periodic <u>ex parte</u> communications with the Master about administrative matters.[10] Some of these discussions concerned the bills of the Master and those he had been authorized to employ. They also included discussion of additional individuals or organizations the Master proposed to employ and the justification for doing so. These discussions at times included identification of the issues that in the Master's view justified the retention, but not the substance or merits of those issues. The existence of certain issues, but not their merits, were also discussed in connection with the Master's several requests for extensions of the original October 10, 2017 deadline. Oct. 2, 2017 Order, Ex. A (Docket No. 207-1); Dec. 14, 2017 Order, Ex. A (Docket No. 214-1); Mar. 1, 2018 Order, Ex. A (Docket No. 216-1); Apr. 23, 2018 Order, Ex. A.

---

[10] Some of the discussions with the Master included his counsel, William Sinnott. References in this Memorandum to communications with the Master include some communications with both the Master and Sinnott.

More specifically, the court periodically discussed with the Master issues concerning the bills for his fees and expenses. The most significant such discussion was disclosed in a May 25, 2017 Memorandum and Order in which I approved an increase in the Master's hourly rate from $800 to $900. See Docket No. 206. In that Order, I wrote:

> The court did not give plaintiffs' counsel prior notice of this issue and the Special Master's request because doing so would involve disclosing his bills and, therefore, injure the confidentiality of the Special Master's investigation, which is the reason for the ex parte submissions of those bills. However, if plaintiffs' counsel object promptly to the Special Master's rate being raised to $900 an hour or to the process by which the decision to do so has been made they may file a motion requesting that the court reconsider its approval of the increased rate.

Id. at 2-3.

On October 24, 2017, I issued an order requiring Labaton to return an additional $1,000,000 to the court for the cost of the Master. See Docket No. 208. On April 23, 2018, I ordered Labaton to return another $800,000 more to fund the Master's foreseeable future fees and expenses. See Docket No. 217. For the reasons explained in the May 25, 2017 Order raising the Master's hourly rate, I did not give Labaton prior notice and an opportunity to be

34

heard concerning the additional payments.[11]  I did, however, order
that "any request for reconsideration" of the October 24, 2017
Order requiring the $1,000,000 payment "shall be filed by October
31, 2017." Docket No. 208 at 4, ¶3. No objection was then filed.
I did not include a similar provision in the April 23, 2018 Order.
However, it is evident Labaton understood that it could object as
it made the $800,000 payment under a reservation of rights to
contest that payment, see Docket No. 222, and on June 19, 2018 it
did so.  See Docket No. 302.

I also had discussions with the Master in which he identified
issues that had emerged that would impede his ability to file his
Report by the original October 10, 2017 deadline, and later
extensions of the deadline.  Those discussions also involved the
Master's request for authorization to retain Professor Stephen
Gillers to advise him on the issues relating to Chargois.  As
indicated earlier these discussions did not include the merits of
the issues that were identified.

---

[11] I now realize that Federal Rule of Civil Procedure 53(b)(4)
requires that the court give the parties notice and an opportunity
to be heard before amending an order appointing a Master.  The
better practice would have been to devise a way to give the law
firm prior notice of the additional payments I was considering
ordering in some fashion that would have maintained the
confidentiality of the Master's investigation.  I do not believe,
however, that the fact that I did not give the law firms prior
notice, when they knew they could seek reconsideration of my
orders, would cause, or contribute to causing, a reasonable person
to question my impartiality.

More specifically, in August 2017, the Master told me that after depositions had been completed his team had found emails regarding a lawyer in Texas that would require reopening some depositions and additional discovery, which he expected the law firms would oppose. Therefore, the Master anticipated requesting an extension of the October 10, 2017 deadline for filing his Report.

In September 2017, the Master told me that he did indeed need such an extension and that the parties had agreed to it. To justify his request, the Master explained that the Texas lawyer had been paid 5.5% of the approximately $75,000,000 in attorneys' fees I had awarded, and that the payment had not been disclosed all of plaintiffs' lawyers or to me. I told the Master I wanted him to conduct a thorough investigation and to complete it as soon as reasonably possible. I agreed to extend the deadline for his Report to December 15, 2017, and directed the Master to send me a letter concerning his request. He did so and I made the letter part of the public record in granting the requested extension to December 15, 2017. See Docket Nos. 207 and 207-1.

In October 2017, the Master informed me that he had entered a Protective Order that, among other things, provided the parties an opportunity to request that parts of his Report be sealed. I agreed to revise the Order appointing the Master to provide such an opportunity and did so. See Docket No 208.

36

The Master subsequently requested authorization to retain
Gillers, an expert in legal ethics, at the rate of $900 an hour,
although his retention would further delay the submission of the
Master's Report because of Gillers' limited availability.    In
support of his request, the Master explained that Labaton had
retained two experts, including Harvard Law School professor
William Rubenstein,[12] who opined that the payment to the Texas
lawyer was an ethically permissible "referral fee" which was not
required to be disclosed to the court.  Gillers, I was told, would
provide a contrary opinion that the Master believed was important
to present.  The reasons for the conflicting expert opinions were
not disclosed or discussed.  I authorized the retention of Gillers.

The Master subsequently informed me that he had told the law
firms that he had retained Gillers.  He also said that he agreed
to allow Labaton to take Gillers' deposition and to present
argument concerning Gillers' opinions to the Master.  He explained
that while this would take time, the issues were threatening to
Labaton and he wanted to consider its views fully before submitting
his Report.  I directed the Master to send me a letter memorializing
his request.  He did so.  On December 14, 2017, I issued an order

---

[12] I have a vague memory that, sometime after the Master was
appointed, I received an email or letter from Rubenstein inviting
me and, I believe, other judges to an event, possibly at his home.
I cannot find the email or letter and may be mistaken about whether
it came from Rubenstein.  However, any such message did not mention
his involvement in this case.

extending the deadline for the Master's Report to March 15, 2018, and attached his letter to it.    See Docket No. 214, 214-1.

In late February 2018, the Master told me that he had provided Gillers' report to the law firms, which were shocked by his opinions and wanted eight more weeks to respond to them.    However, I expressed my reluctance to extend the deadline for the Masters Report beyond March 15, 2018, which was six months later than the original deadline. I noted that, under Federal Rule of Evidence 53(f)(1), I have the authority to take evidence concerning an objection, and that was an alternative to law firms presenting additional evidence and argument to the Master.    Nevertheless, I agreed to the Master's request for an extension to April 23, 2018, and directed him to submit a letter memorializing it.    He did so. I issued an order granting the request, appending the Master's letter to it.    See Docket Nos. 216, 216-1.

I subsequently had several discussions with the Master concerning the mechanics of preparing his Report, and the record of his activities, and submitting at least the Report in electronic form.    This resulted in my issuing an Order extending the deadline for filing the Report to May 14, 2018, and attaching the Master's letter requesting the extension to it.    See Docket Nos. 217, 217-1.

I also had limited discussions with the Master on another subject.    In January 2018, he informed me that he had been

38

contacted by prosecutors in the Office of the United States
Attorney for the District of Massachusetts. The Master said that
the prosecutors were investigating Thornton, including whether a
possible illegal payment had been made to an official of a pension
fund. They wanted to obtain information from the Master. The
Master said that he did not provide the prosecutors any information
beyond telling them that his Report was then due on March 15, 2018.
He said he had told the prosecutors that he would consult me about
their request.

The Master and I noted that prosecutors' investigation
suggested questions about whether any of the money paid to the
Chargois had been used to make political contributions or other
payments, and the potential for the criminal investigation to
expand to include Chargois. I told the Master that I was reluctant
to authorize any informal cooperation with the prosecutors. I
directed the Master to tell them to send him a letter so I could
consider a specific request.

The prosecutors sent the Master a letter requesting that they
be given immediately copies of the depositions and witness
statements he had, and that they be provided any other relevant
documents after his Report was filed. The Master sent the letter
to me. I then instructed the Master to tell the prosecutors that
he was not authorized to provide them information or documents
voluntarily. Rather, if they wanted any documents or information

before his Report became public they would have to issue a grand jury subpoena or file a motion to be decided by me. The prosecutors have done neither.

After it was publicly reported that the Master's Report had been filed under seal, one of the prosecutors told a member of my staff that she would like to speak with me. She did not identify the matter she wanted to discuss. I instructed that member of my staff to tell the prosecutor that if the requested discussion related to this case, I would not speak to her. I have not heard further from the prosecutor.

In addition, in August 2017, I received an email from the National Association of Legal Fees Analysis inviting me to participate, with other judges, in a CLE webinar, "View from the Bench: Awarding Attorneys' Fees in Federal Litigation." I responded, "[t]hank you for this invitation, which I am unable to accept."

C.   Events Following the Submission
     of the Master's Report

On May 14, 2018, the Master filed his Report and Recommendation, an Executive Summary of it, and Exhibits. See Docket No. 224 (under seal). I allowed that submission to be submitted temporarily under seal so the lawyers could propose redactions and I could decide which, if any, were justified. See Docket No. 220.

On May 16, 2018, I directed the Master to provide the plaintiffs' law firms the sealed submissions and ordered that any proposed redactions be submitted under seal by May 31, 2018. See Docket No. 223. In my Memorandum and Order, I provided a framework for proposing redactions which included, but was not limited to, the following principles. The public has a right documents and information on which a judge relies in making judicial decisions. Id. at 3 (quoting F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987)). The public's right to inspect such records is not absolute, but only the most compelling reasons can justify non-disclosure of judicial records. Id. I noted that "[a] properly invoked attorney-client privilege may be sufficient to overcome the presumption of public access. Id. at 4 (citing Seidle v. Putnam Inv., Inc., 147 F.3d 7, 9-10 (1st Cir. 1998)) (emphasis added). Although not explained in the Memorandum, the attorney-client privilege belongs to the client, not the attorney, and, therefore, the client must invoke it. See Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002); United States v. Mass. Inst. of Tech., 129 F.3d 681, 684 (1st Cir. 1997).

On May 16, 2018, the Master informed me that State Street should also be provided the sealed submissions and an opportunity to propose redactions. On May 17, 2018, I issued an order authorizing both. See Docket No. 225. The same day, Labaton filed an objection to State Street receiving the unredacted Report and

related documents.  See Docket No. 227.  I immediately vacated my earlier Order, and directed the parties to discuss their interests and recommend a means of accommodating them.  See Docket No. 228.

Labaton also raised issues concerning the scope of the record to be filed by the Master.  I directed the law firms to discuss these issues with the Master.  See Docket Nos. 222, 226.

On May 24, 2018, several of the law firms, including Labaton, filed a motion requesting that the deadline for their proposed redactions be extended to June 11, 2018.  On May 25, 2018, the Friday before Memorial Day, I issued an Order extending the deadline for proposed redactions to June 5, 2018, without prejudice to a possible further extension to June 11, 2018.  See Docket No. 223.  I scheduled a hearing on the motion for May 30, 2018.  The Order also stated, in part, that:

> George Hopkins, Executive Director of Arkansas
> Teacher Retirement System ("ATRS"), and anyone
> else required to act for ATRS in this case
> shall attend [the hearing].  The Master's
> Report and Recommendation (Docket No. 224
> under seal), including pages 89 to 124 and 368
> to 371, and Executive Summary (Docket No. 224-
> 1 under seal), including pages 25 to 29 and 50
> to 51, raise questions concerning: whether
> ATRS properly discharged its duties as Lead
> Plaintiff, see, e.g., Garbowski v. Tokai
> Pharma., Inc., 2018 WL 1370522 (D. Mass.
> 2018)(Wolf, D.J.); whether ATRS should be
> replaced as Lead Plaintiff; whether there is
> now a conflict between the interests of
> [Labaton, Lieff, and Thornton] and the class;
> and whether new class counsel should be
> appointed to provide independent advice to the
> class whether or not ATRS continues as Lead

42

> Plaintiff. Mr. Hopkins and any other
> representatives of ATRS shall be prepared to
> discuss these issues at the May 30, 2018
> hearing.

Id. at 2-3.

In Garbowski, I had recently described the duties of a lead plaintiff in a Private Securities Litigation Reform Act case, which I understand to be comparable to the duties of a class representative in any federal class action. As required by Federal Rule of Civil Procedure 23(a)(3), a class representative's interests must be typical of those of the class. See Garbowski v. Tokai Pharms., Inc., 302 F. Supp. 3d 441 at *4 (D. Mass. 2016). In addition, a class representative must fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a)(4); Garbowski, 302 F. Supp. 3d at *3.

As the D.C. Circuit has explained:

> Basic consideration of fairness require that
> a court undertake a stringent and continuing
> examination of the adequacy of representation
> by the named class representatives at all
> stages of the litigation where absent members
> will be bound by the court's judgment. Two
> criteria for determining the adequacy of
> representation are generally recognized: 1)
> the named representative must not have
> antagonistic or conflicting interests with
> the unnamed members of the class, and 2) the
> representative must appear able to vigorously
> prosecute the interests of the class through
> qualified counsel. Senter v. General Motors
> Corp., 532 F.2d 511, 524-25 (6th Cir. 1976).

Nat. Ass'n of Regional Medical Programs, Inc. v. Mathews, 551 F.2d 340, 345 (D.C. Cir. 1976); see also 7A Wright & Miller, Fed. Prac. & Proc. §§1765, 1768 (3d ed. 2018).

Therefore, as I wrote in Garbowski, in assessing adequacy, "the court must [] consider whether the proposed lead plaintiff 'has the ability and incentive to represent the interests of the class vigorously, [whether he] has obtained adequate counsel, and [whether] there is a conflict between [lead plaintiff's] claims and those asserted on behalf of the class.'" Garbowski, 302 F. Supp. 3d at *4 (quoting In re Cendant Corp., 264 F.3d 201, 263 (3rd Cir. 2001)). Among other things, an adequate class "representative must be able to ensure that counsel do not 'litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrong doing." Id. (quoting S. Rep. 104-98 (1995) at 6) (citing In re Cendant Corp., 264 F.3d at 255).

I was concerned about whether ATRS and Hopkins now satisfy the typicality and adequacy requirements to continue to serve as lead plaintiff. The matters that prompted the appointment of the Master raised serious questions about the veracity, and possibly the legality, of statements made by Labaton and Thornton, among others, in connection with the fee petition. In his Report the Master recommends that Labaton, Thornton, and Lieff be ordered to

44

return to the class the more than $4,000,000 in the claimed lodestar that resulted from double counting the hours of contract attorneys. The Master also recommends that those firms be directed to return to the class approximately $2,300,000 because of what he characterizes as improperly inflated rates attributed to the contract attorneys. In addition, the Master recommends that Labaton be ordered to disgorge the $4,100,000 paid Chargois, with $3,400,000 going to the attorneys for the ERISA class and the balance to the class.[13]

The court understands that Labaton, at least, will object to the Master's recommendations. The court will be open-minded concerning the merits of those objections. However, there is now a conflict between the interests of the class and the interests of its Lead Counsel, Labaton. This makes it particularly important that any class representative have interests that do not conflict with the interests of the other class members, and have the ability and incentive to represent the class vigorously with regard to whether Labaton and the other law firms should be required to disgorge funds for the benefit of the class.

---

[13] The Master also recommends that a sanction of between $400,000 and $1,000,000 be imposed on Thornton, that Garrett Bradley be referred to the Massachusetts Board of Bar Overseers for disciplinary action, and that Thornton be required to disgorge for the benefit of the class about $188,000 because Michael Bradley was included in Thornton's lodestar at an improperly inflated rate of $500 an hour.

45

ATRS has employed Labaton since 2008.  It has a contract to continue to do so.  This relationship alone raises questions about whether ATRS is typical and will vigorously represent the interests of the class, uninfluenced by the competing interest of Labaton in the Master's recommendation that Labaton, Lieff, and Thornton be required to disgorge more than $10,000,000.

These questions are magnified by the Master's recommendation that the court find that Labaton, Thornton, and Lieff had a duty to disclose to ATRS, the class, and the court the $4,100,000 paid to Chargois in connection with this case.  Hopkins has stated that he did not expect to be told of this payment and had no responsibility to learn of it.  See Report at 257, n.7.  This may or may not prove to be correct.  However, Hopkins' position prompted the Master to write that:

> The class had a right to know that Lead
> Counsel intended to, and did, pay $4.1 million
> out of settlement funds to a person who
> performed no work in this case, as a result
> of Lead Counsel's own pre-existing
> obligation, whether or not the payment itself
> was permitted under Massachusetts ethical
> rules.  We cannot see how, in light of a clear
> dereliction of his fiduciary duties to the
> class, Hopkins can fairly and adequately
> protect the class's interests moving forward.

Id.; see also May 30, 2018 Tr. at 17 (Mr. Sinnott stating, "there was testimony by Mr. Hopkins that was very troubling . . . with respect to what he saw as his role with respect to the class and the members."). Therefore, it is foreseeable that the conduct of

46

Hopkins on behalf of ATRS will be an issue in future proceedings and that, to some extent, his interests will be aligned with Labaton's interests, which now conflict with the financial interests of the class.

When, on May 25, 2018, I ordered Hopkins to participate in the May 30, 2018 hearing, I also anticipated that the Master's Report would raise questions concerning the origins of the relationship between Labaton and ATRS. As explained earlier, the Boston Globe had published several articles suggesting that campaign contributions and use of Garrett Bradley's political connections had generated class actions brought by pension funds overseen by the Massachusetts and Plymouth County Treasurers, which resulted in more than $100,000,000 in fees for Labaton, and many millions of dollars were reportedly given to Thornton. Those articles mentioned this case and the Master's investigation.

The Master's Report includes similar information with regard to Labaton's relationship with Chargois concerning ATRS. According to the Master, Labaton had agreed to pay Chargois 20% of any fee it earned from representing ATRS as lead counsel in any class action. See Report at 125. Labaton reportedly had a similar agreement with Thornton. See id. at 93 & n.76. As indicated earlier, the Report includes a message Chargois reportedly wrote to Labaton on October 18, 2014, stating:

47

Our deal with Labaton is straightforward. <u>We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases.</u> Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period.

<u>Id.</u> at 125, n.111 (emphasis added). The Special Master stated that he "did not investigate further into the background facts alleged by Chargois in this email as to how to Chargois/Labaton/ATRS relationship was originated and developed" because, in his view, "[t]his subject [was] beyond the scope of the Special Master's assignment from the Court." <u>Id.</u>

The truth of Chargois' statements may be disputed by Labaton. I will open-mindedly decide any objection to them <u>de novo</u>.

However, the substantial interest of the media in the origins of Labaton and Thornton's relationship with pension fund clients, and the Department of Justice investigation of Thornton caused me to expect that when the Master's Report is unsealed, questions will be raised about the origins of ATRS' relationship with Labaton.[14]   Regardless of their merit, such questions would

----

[14] A statement made at the May 30, 2018 hearing by Lukey indicates that my prediction would, without the motion for recusal, have proven to be correct. She said that after I "issued the [May 25, 2018] order requiring Hopkins presence, it generated, as unfortunately often occurs, some pretty extraordinary and inflammatory online media reactions, including language such as

48

contribute to making ATRS atypical of the class and possibly an inadequate class representative.

At the May 30, 2018 hearing, I developed a process and schedule for briefing proposed redactions in stages and granted the earlier motion to extend to June 11, 2018 the deadline for submitting proposed redactions. See Docket No. 237. I also scheduled a June 22, 2018 hearing to address the proposed redactions that would be closed to the public. Id.

I concluded the May 30, 2018 hearing with questions to Hopkins. Having listened to the previous colloquy, Hopkins stated that he was "totally aware" that there now "may be a conflict between the interests of Labaton and the other lawyers, who want to vindicate the propriety of everything they did and keep the money, and the class that would benefit if [the Judge] ordered some of that money paid back." May 30, 2018 Tr. at 69-70. He also stated that as class representative, he was not then getting legal advice from anyone other than Labaton. Id. at 67. He did not think that he was receiving legal advice from Lukey. Id. at 66. In any event, he stated that he understood that the client would have to

---

Hopkins must have done something explosive or there must have been shenanigans." May 30, 2018 Tr. at 10.   Similarly, in one of Labaton's memos in support of its proposed redactions it wrote that "[t]he press has paid considerable attention to this case, has scrutinized public filings, and has investigated information disclosed in this public filings."   See Docket No. 254-1 (under seal) (emphasis added).

assert any attorney-client privilege, and that he would do so only
to protect some "viable interest" and not to cover-up for anyone.
Id. at 68.

With regard to ATRS role, Hopkins testified that a class
representative "should be very cautious about trying to allocate
attorneys' fees between law firms and a class." Id. at 74. More
specifically, he did not believe that ATRS should take a position
on whether Labaton and other lawyers should be ordered to return
some of the fees awarded to the class. Id. at 70.

In addition, Hopkins said that he did not believe that as
class representative he had a responsibility to inquire about how
the attorneys divided a fee award, including whether any referral
fees were being paid. Id. at 71. He stated that it was the court's
duty to do so, and that I had subsequently ordered disclosure of
such information in another case in which ATRS is lead plaintiff,
ATRS v. Insulet Corp., C.A. No. 15-12345. Id. at 73.[15]

In response to my question about why Hopkins wanted ATRS to
continue to serve as class representative, Hopkins asked for and

---

[15] As explained earlier, in 2017, I had been informed of the payment
to Chargois by the Master in connection with his requests for more
time to complete his work and to retain Gillers. This educated me
to understand that there may be substantial fees shared with
lawyers in class actions that are not disclosed to the court in a
request for an award of attorneys' fees. Therefore, at the March
9, 2018 hearing for preliminary approval of the proposed settlement
in Insulet, I asked if there were attorneys who had not filed an
appearance that would share in the fee award. See C.A. No. 15-
12345, Docket No. 15 at 15.

received opportunity to provide "a little history." May 30, 2018
Tr. at 50.  He said he became Executive Director of ATRS in 2009,
after serving in the State Senate.  Id. Labaton already had a
contract with ATRS.  Id. at 52.  When he took office, Hopkins did
not think that he should give priority to class action law suits.
Id. at 52, 53.  However, "political leaders" persuaded him to do
that.  Id.

When asked who those political leaders were, Hopkins said
David Malone, a former Executive Director of ATRS with whom he had
served in the Senate, several legislators, members of the
Governor's staff, and officials in the Department of Finance
Administration of Arkansas.  Id. at 53-54.  In response to my
question, Hopkins said he knew Faris, who the Master reports was
prompted by Chargois and his partner Herron to introduce ATRS to
Labaton, earning Chargois $4,100,000 in this case and, according
to Chargois, a right to 20% of Labaton's fees in all other ATRS'
cases in which Labaton represented ATRS.  Report at 91-94.  Hopkins
stated that: Faris was a State Senator when he became Executive
Director of ATRS; the Senate indirectly supervised ATRS; Hopkins
had discussed class action lawsuits, including the State Street
case, with Faris; but Faris was not one of the legislators who
convinced Hopkins to give high priority to class actions.  May 30,
2018 Tr. at 53-56, 61.  Hopkins said that he had discussed Labaton,
and other firms, with Faris.  Id. at 59.

However, until Hopkins learned it from the Master's investigation, he did not know that Faris had introduced Labaton to ATRS. Id. at 58, 61. The Master's Report prompted Hopkins to speak to Faris about his introduction of Labaton to ATRS and Faris confirmed he had done so. Id. at 59-60. However, Faris never mentioned Herron to Hopkins. Id. at 60.

In response to further questioning, Hopkins testified that he spoke to Faris about his introducing Labaton to ATRS right after Hopkins' deposition in the Master's proceedings. Id. at 61. Hopkins also said that, after I had on May 25, 2018 ordered him to appear at the May 30, 2018 hearing, Hopkins met in his office with Faris at 9:00 a.m. on Memorial Day, May 28, 2018 and they discussed the hearing. Id. at 62-63.

I concluded my colloquy with Hopkins by raising questions to be considered by ATRS and, if necessary, further by me concerning whether ATRS should be allowed to continue as class representative. They included questions about whether it would injure ATRS' reputation, and possibly its opportunities to serve as lead plaintiff in other cases, if I found Labaton engaged in misconduct. Id. at 73. Hopkins said he had not considered these issues. Id.

I subsequently summarized my concerns about whether ATRS should continue as class representative and told Hopkins I would give him an opportunity to consider whether it wished to do so. Id. at 78. I noted that: ATRS selected Labaton and other lawyers

52

whose conduct had been called into question; the Master recommended
that I order those lawyers to return to the class a significant
amount of money; ATRS had a continuing relationship with those
lawyers and is still getting advice from them; and ATRS has not
consulted any lawyer who does not have a stake in these proceedings
about what would be in the best interest of the class ATRS
represents.  I also said:

> I don't want to get into more detail about
> this, but you know that questions have been
> raised by the Report and Recommendation about
> the origins of Labaton's relationship with
> Arkansas Teacher, and they're just questions.
> But to the extent that those issues are
> litigated in this case, they could be at least
> embarrassing to Arkansas Teacher.
>
> And that may give you an incentive, even if
> you're confident that you would resist it, to
> not vigorously represent the class the way
> somebody who did not have this historic
> relationship in these issues would.

Id. at 79. I concluded by saying:

> [M]y paramount responsibility is to the class
> and to make sure - try to assure that at this
> point it's represented by a lead plaintiff
> who's typical and adequate, and will not have
> its or his role representing the class
> complicated by unique issues and potential
> conflicts of interest. That's my concern.  I
> would like you to think about that.

Id.  Therefore, I ordered Hopkins to report, by June 6, 2018,
whether ATRS wished to continue to get advice from Labaton or from
other counsel.  Id. at 81; Docket No. 237.

Lukey then requested the sidebar conference, which is the primary basis for the motion for my recusal. At the sidebar I explained the reasons for some of my questioning of Hopkins. I noted that according to the Master's Report: Labaton had asked Chargois to introduce it to institutional investors in Arkansas; Chargois did not know any institutional investors; Chargois did, however, ask his partner in Arkansas, Herron, who also did not know any institutional investors; Herron knew State Senator Faris; Faris introduced Labaton to ATRS; ever since Chargois has been entitled to 20% of Labaton's fees in ATRS cases despite not doing any work on them; and, there was an assiduous effort to keep that from counsel in this case and others. May 30, 2018 Sidebar Tr. at 1.[16]

The following colloquy ensued:

> THE COURT: And I think that — and they may not be questions to be resolved in this case, but I think it is foreseeable that when the Report becomes public, there are going to be questions about the origin of this

---

[16] As explained in my June 11, 2018 Order (Docket No. 240), the side bar conference was originally sealed because the colloquy did not relate to any pending motion to be decided by me. That discussion became central to Labaton's sealed motion for recusal, which relates to respect for the legal system. Therefore, the presumption of a public right to court records on which judicial decisions are based became relevant. See Standard Fin. Mgmt. Co., 830 F.2d at 408-09. Accordingly, I provided Labaton an opportunity to advocate for continued impoundment of the sidebar conference and the references to it in Labaton's submissions concerning recusal. See Docket No. 280, ¶1. Labaton instead stated that it did not object to unsealing the transcript and submissions. See Docket No. 292. I did so. See Docket No. 300.

relationship and whether all those millions of
dollars stopped with Mr. Chargois.

Mr. Kelly was a prosecutor, and Arkansas these
days is -- ears may perk up.

But that was part of the motive [for some of
my questions].

I don't know what Mr. Sinnott would say.

I do not object to you saying what you want to
say, and future proceedings will be what
they'll be, but --

MS. LUKEY: Your honor, are you suggesting
there was impropriety involving Senator Faris
with the monies being paid? Because there is
nothing. I mean nothing.

THE COURT: I'm suggesting that those questions
-- yes those questions occurred to me when I
read it.

I don't know that they will be resolved here,
but I am concerned that when the relationship
between Arkansas Teacher and Labaton is
disclosed, and Arkansas Teacher's is going to
be defending itself, and its interests are
different than the interest of the class.

Id. at 2. Lukey then said that she was "in shock" and "appalled"

that I seemed to be suggesting "public corruption," and asserted

that the Master in his Report "made no such suggestion." Id. at

4-6. Lukey then asked me if I had "formed the opinion that "some

form of public corruption occurred," id. at 7, or "that money was

going back to Senator Faris or somebody else," id. at 8. I

responded:

> No.
>
> But I've formed the opinion that those are questions that are raised, and they may well not be questions that would be resolved or could be resolved in this case. But I can foresee the reasonable likelihood that the conduct of Arkansas Teacher is going to become part of the controversy, and it causes me to have questions about whether it's an appropriate lead plaintiff.
>
> Who is representing - remember what this is about. Who is representing the class?

Id. at 8.

After further colloquy relating to whether ATRS should continue as class representative, Lukey asked for an opportunity to say publicly that the alleged "misconduct" at issue in the Sealed Report and Recommendation related to whether Labaton had paid Chargois a permissible "referral or origination fee." Id. at 13. I authorized Lukey to make her public statement and said I would permit Sinnott to respond that the payment was an impermissible "finder's fee." Id. at 13-14.

They each did so. See May 30, 2018 Tr. at 82-84. I then stated, "I don't have answers to any of these questions now, but I did put to Mr. Hopkins questions that I think are important in the discharge of my duty to try to ensure that the class is properly represented and to try to get these issues resolved sooner rather than later -- so the Court can get the benefit of the views of the class." Id. at 84. This was followed by a brief lobby conference.

On June 6, 2018, Hopkins filed an affidavit stating that he had obtained advice from independent counsel, Thomas Hoopes, and that ATRS wished to continue as class representative, receiving continuing advice from Mr. Hoopes. See Docket No. 258.   On June 8, 2018, Labaton filed its motion seeking my recusal under §455(a).

IV. ANALYSIS

As explained earlier, Labaton does not contend that I am actually biased or prejudiced, or that I actually have personal knowledge of disputed evidentiary facts, any of which would require my recusal under §455(b)(1).   Rather, Labaton suggests that a reasonable person would doubt that I am not biased or prejudiced, or do not have personal knowledge of disputed evidentiary facts. Therefore, it argues that my recusal is required by §455(a).  This issue must be decided from the perspective of a fully informed member of the public, rather than the perspective of a litigant or the judge.   See Voccola, 99 F.3d at 14; El Felix de Puerto Rico, 36 F.3d at 141; In re United States, 660 F.2d at 695.

As noted earlier, I am required to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation ...." Nat. Ass'n, 551 F.2d at 334. As the D.C. Circuit's statement indicates, an organization that is an adequate class representative at the outset of a case may be an inadequate representative as the case evolves. See also 7A Wright & Miller,

§1765 ("If later events demonstrate that representatives are not adequately protecting the absentee[] [class members], the court may take whatever steps it deems necessary under Rule 23(c) or 23(d) at that time."). Therefore, following the submission of the Master's Report I had a duty to consider whether ATRS now has "antagonistic or conflicting interests with unnamed members of the class" and whether ATRS still "appear[s] able to vigorously prosecute the interests of the class through qualified counsel." Nat. Ass'n, 551 F.2d at 345.

     As also explained earlier, Labaton relies primarily on the colloquy at the then non-public May 30, 2018 sidebar conference in seeking my recusal.  In open court I had asked Hopkins a series of questions relating to the issues identified in my May 25, 2018 Order, to obtain information relevant to whether ATRS continued to be a typical and adequate representative of the class. Without being asked, Hopkins stated that "political leaders" in Arkansas persuaded him to give high priority to bringing class action law suits. In view of its contract with ATRS, Labaton was positioned to become Lead Counsel in at least some of such suits and, as a result, receive millions of dollars.  When asked about those political leaders, Hopkins identified one by name and others by office.  As explained earlier, he did not mention then former State Senator Faris. Faris is the sole legislator named in the Master's Report. He was identified in the Report as the person that

58

Chargois' partner Herron had influenced to introduce Labaton to ATRS. That introduction, according to the Master, resulted in an agreement that Chargois would receive 20% of all fees awarded to Labaton for serving as Lead Counsel in ATRS cases, including a payment of $4,100,000 relating to this case. In response to further questions, Hopkins testified that he had over the years discussed with Faris class actions, Labaton, and questions relating to Labaton's conduct that had emerged in this case. Hopkins also revealed that after being ordered on May 25, 2018 to be prepared to testify at the May 30, 2018 hearing, he had met in his office with Faris on May 28, 2018 -- Memorial Day -- and discussed the hearing.

As I repeatedly explained in open court, my questions to Hopkins were intended to develop information concerning his understanding of ATRS' duties as a class representative in the present posture of this case, how ATRS would discharge its duties if allowed to continue as class representative, and whether ATRS is now a typical and adequate representative of the class. The Boston Globe had publicly reported on its investigation of campaign contributions made by Thornton and Labaton, and on the alleged exploitation of Garrett Bradley's position in the Massachusetts House of Representatives to get Labaton and Thornton business that generated many millions of dollars in attorneys' fees from Massachusetts pension funds. The Boston Globe has also reported

59

that federal prosecutors were investigating Thornton's campaign contributions. In addition, I had learned from that Master that federal prosecutors in Massachusetts were investigating whether Thornton had made an illegal payment to a pension fund official.[17] Therefore, I foresaw that it was likely that, when the Master's Report became public, questions would be raised by the media, at least, about the origins of ATRS' relationship with Labaton.  Any such questions would contribute to ATRS being unique, rather than typical of the class, and possibly an inadequate representative of the class in the current proceedings.

I explained and amplified this concern at the then confidential sidebar conference Lukey requested.  Having in mind the Boston Globe articles and the United States Attorney's investigation, I said it was foreseeable that when the Master's Report became public there would be questions about the origins of Labaton's relationship with ATRS, and whether all of the millions of dollars paid to Chargois had stopped with him.  I again explained that these issues related to whether ATRS remained a typical and adequate class representative.  In response to Lukey's questions, I stated I had not formed an opinion on whether money

_____

[17] I knew that an official act by a public official as a quid pro quo -- meaning in explicit exchange for -- for an otherwise legitimate campaign contribution is a form of extortion in violation of 18 U.S.C. §1951.  See McCormick v. United States, 500 U.S. 257, 275 (1991); 18 U.S.C. §1951.

was going back to Faris or anyone else, or on whether public corruption had occurred. I added again that I foresaw that such questions would be raised when the information in the Master's Report was unsealed. I stated that while they might not be questions that could be resolved in this case, such questions would make ATRS part of the controversy and, therefore, possibly no longer an appropriate class representative.

My information concerning the roles of Herron and Faris in the genesis of Labaton's relationship with ATRS came exclusively from the Master's Report. In the process of deciding whether to extend the deadline for the submission of the Master's Report and whether to authorize him to employ Gillers, I did learn that more than $4,000,000 had been paid to Chargois. This matter is, however, far more fully described in the Master's Report.

As explained earlier, in almost all cases a meritorious motion for recusal under §455(a) must be based on a judge's acquisition of information extra-judicially. See Liteky, 510 U.S. at 551. A disqualifying appearance of bias or prejudice can be based on information the judges acquires in the litigation, but only if "it is so extreme as to display clear inability to render fair judgment." See id. Therefore, if the motion does not assert a judge has information from an extrajudicial source, a "high threshold" must be met to justify recusal. Id. at 558 (Kennedy, J., concurring). More specifically, "under §455(a), a judge should

61

be disqualified only if it appears that he or she harbors an aversion, hostility, or disposition of a kind that a fair minded person could not put aside when judging the dispute." Id.; see also Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58); In re United States, 158 F.3d at 34 (same).   A reasonable person could not believe that my statements at the May 30, 2018 hearing, in open court or at the sidebar, meet this standard.

The conclusion that a reasonable person could not question my impartiality is not qualified by Labaton's suggestion that such a person could believe that I had improper, ex parte communications with the Master.  Labaton cites no case in which a judge's recusal has been required based on his interactions with a Master.  Indeed, there does not appear to be any such reported case.

In re Brooks, 383 F.3d 1036 (D.C. Cir. 2004) is, however, an illuminating decision.  As indicated earlier, pursuant to Federal Rule of Civil Procedure 53(a)(3), "in appointing a master, the court . . . must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3).

In In re Brooks, the D.C. Circuit found that the district judge's recusal was not required under §§455(a) or (b)(1) because of his ex parte communications with a Master. The court noted that those provisions require a judge's recusal when he has "personal knowledge of disputed evidentiary facts" or when his "impartiality might reasonably be questioned." 383 F.3d at 1041. The movant

submitted time records "that reveal[ed] seven private meetings [between the Master, and] the Court for a total of approximately eight hours." Id. It alleged that the Master had impermissibly informed the court of the content of meetings the Master had with certain individuals involved in his investigation concerning federal officials' handling of monies held in trust for Native Americans.

However,

[t]he district court stated: "[i]t is not only appropriate but necessary for the Court, as principal, to consult with its agents regarding the manner in which they are carrying out their assigned duties .... [T]hroughout these regular consultations, the Court discussed with the Master the general nature of the ongoing tasks that the Master was involved with, in order to ensure that the Master was responsibly carrying out the duties to which he was assigned." . . .

"In the course of a typical meeting, for example, the [Master] might inform the Court that he planned to travel to New Mexico to meet with the Office of the Special Trustee, and receive a briefing about their role in the historical accounting process. Or he might explain that he traveled to Billings, Montana to meet with title records office personnel, examine their hard copy records, and review the pilot [Trust Asset and Accounting Management System]. Or he might inform the Court that he had been briefed by the Deputy Commissioner of the Bureau of Indian Affairs about the organization of their office." . . .

"[T]he only reason that the Court knew anything about the ... meeting [in question], or the background relating to that meeting, is that the [Master] was compelled to 'present[] the facts surrounding the request of the Deputy Secretary' to hold the meeting, in order that the Court could make an informed decision about whether to authorize the [Master's] attendance at the meeting."

63

Id. at 1041-42 (citations omitted).

The D.C. Circuit wrote that "the district court reasonably explained that in referring to the "nature, extent, and substance of [the Master] meetings" with third parties, the court was concerned with the subject matter, not the actual content, of those meetings." Id. at 1043. It stated that:

> [M]oreover, it is not surprising that the district judge
> met many times with the Special Master and . . .; he had
> to oversee and to coordinate [the Master's] efforts on
> the court's behalf during four years of complicated and
> contentious litigation. Keeping a careful inventory of
> the tasks they had performed appears sensible,
> particularly in the light of the defendants' several
> challenges to [the Master's] requests for compensation.

Id. at 1043. The D.C. Circuit stressed that "the district judge has described the nature of the ex parte contacts, and stated unequivocally that those contacts were of a procedural and not a substantive nature." Id. at 1044. It concluded, therefore, that the judge's contacts with the Master had not given him "personal knowledge of disputed evidentiary facts" and that his impartiality could not reasonably be questioned. Id. at 1043.

The instant matter is, at most, analogous to In re Brooks. At the March 7, 2017 hearing, I informed the parties that I had a duty to protect against unreasonable expense or delay and, therefore, anticipated having ex parte communications with the Master. See Mar. 7, 2017 Tr. at 68. However, I expressed my intention to limit those communications to "administrative

matters." _Id._ The March 8, 2017 Order reiterated this. _See_ Docket No. 173, ¶6 ("The Master may communicate with the court _ex parte_ on administrative matters.").

My communications with the Master were limited to administrative matters. I was initially told about the payment of the $4,100,000 to Chargois, and the Master's request for authorization to retain Gillers to advise on issues relating to Chargois, in connection with the Master's request for an extension of time in which to file his Report. I was told about the existence of a dispute between Gillers and experts Labaton had retained in connection with the Master's requests for further extensions. Labaton has not asked that the references to the payment to Chargois concerning this case, or that he is entitled to up to 20% of Labaton's fee in each case for which ATRS is class representative and Labaton is Lead Counsel, be redacted from the public version of the Master's Report. I do not expect that Labaton will object to the accuracy of the claim the payment to Chargois concerning this case occurred. Labaton has stated, however, that it objects to Gillers' opinions concerning the ethical propriety of the payment. I did not discuss with the Master the substance or merits of Gillers' opinions or the law firms' experts' competing views.

In not moving for my recusal under §455(b)(1), Labaton implicitly acknowledges that the information I received _ex parte_

65

from the Master does not actually give me "personal knowledge of disputed evidentiary facts concerning the [current] proceeding." §455(b)(1). In any event, ex parte communications implicate §455(b)(1) only "when a judge receives information that does not enter the record [and] the reliability of that information may not be tested through the adversary process." Craven, 239 F.3d at 103 (citing Edgar v. K.L., 93 F.3d 256, 262 (7th Cir. 1996)). This is not such a case. The limited information I received about Chargois is included and amplified in the Master's Report. Labaton's view of the propriety of that payment will be presented fully with its objections, which I can and will decide with an open mind, de novo. In these circumstances, a knowledgeable, reasonable person could not believe that I received ex parte relevant information that is not, or will not be, in the record and, therefore, doubt my impartiality because of my communications with the Master.

Contrary to Labaton's contention, this case is not analogous to Edgar, 93 F.3d at 259-60. In Edgar, the Seventh Circuit found that recusal was required under §455(b)(1), and §455(a) as well, because the judge had, and reasonably appeared to have, "personal knowledge of disputed evidentiary facts," §455(b)(1), when he had ex parte discussions with court-appointed experts about the merits of their opinions and prohibited any attempt to reconstruct those conversations for the record. Id. In contrast, I had no communications with Gillers or, as explained earlier, any

66

discussion with the Master concerning the substance or merits of Gillers' opinions.[18]  Compare In re Faulkner, 856 F.2d 716, 720-21 (5th Cir. 1988) (recusal required under §§455(b)(1) and (a) where judge's relative was a major participant in transaction at issue and "communicated to the judge . . . material facts and her opinions and attitudes concerning those facts").

As explained earlier, it has been held that reasonable people presume that "a judge . . . will rule according to the laws, as enacted, as required by his or her oath." In re Aguinda, 241 F.3d at 204; see also First Interstate Bank of Arizona, 210 F.3d at 988. In In re Brooks, 383 F.3d at 1043, the D.C. Circuit found that for the purposes of §455(b)(1), and §455(a) as well, there is "no reason for not accepting the judge's unequivocal" representation that he did not receive substantive information in his ex parte discussions with a Master. Similarly, in this case a reasonable person would not doubt my explanation that there were proper administrative reasons for my ex parte communications with the Master and that I did not receive from him any extra-judicial information concerning disputed evidentiary facts.

Nor would my communications with the Master concerning the federal prosecutors' request for information cause a reasonable

---

[18] Although not comparable to the facts in the instant case, the First Circuit has noted that even "[e]ngaging in ex parte communications with court-appointed experts need not inevitably require a judge's disqualification." Craven, 239 F.3d at 103.

67

person to question my impartiality. The fact that the United States Attorneys' office was investigating whether Thornton had made illegal campaign contributions had been previously reported by the Boston Globe. The Master consulted me in order to get instructions on how to respond to the prosecutors' request. He told me that the prosecutors said they were investigating Thornton, including whether a possible illegal payment had been made to an official of a pension fund. This information was comparable to the information that had been published by the Boston Globe. I instructed the Master not to provide information to the prosecutors voluntarily.

The information I received from the Master about the prosecutors' request for information did not give me personal knowledge of any evidentiary fact that is disputed in this proceeding. No reasonable person could believe that it did. Nor could a reasonable person believe that my knowledge that federal prosecutors were investigating Thornton would cause me to violate my oath to be impartial.

Labaton also suggests that a reasonable person could question my impartiality in deciding challenges it is making concerning the cost of the Master and the manner in which he performed because I appointed the Master and monitored his activities. Again, Labaton cites no analogous case in support of this contention.

In any event, this argument is unmeritorious. I did appoint the Master, monitor his fees and expenses, and received limited information about his activities in the process of deciding whether to authorize him to retain Gillers, among others, and to extend deadlines. A reasonable person would understand that I did this to discharge my duty to protect against unreasonable expense and delay. See Fed. R. Civ. P. 53(a)(3).

In the Order appointing the Master I stated that "[t]he court intends to disclose the cost of the Master at the conclusion of these proceedings." See Docket No. 173, ¶14. On June 19, 2018, Labaton, Lieff, and Thornton filed under seal a Motion for an Accounting and for Clarification that the Master's Role Has Concluded. See Docket No. 302. After this Motion is briefed, I will decide with an open mind whether the Master's involvement in these proceedings should be terminated and, in any event, whether the request for an immediate accounting should be granted.

Federal Rule of Civil Procedure 53 is premised on the principle that the judge who appointed the Master can and will decide objections to his performance or his recommendations de novo. A knowledgeable reasonable person would not doubt my ability to do that in this case.

In view of the foregoing, my recusal under §455(a) is not justified. Rather, recusal in the circumstances of this case would injure an important interest to be served by §455(a). As the First

69

Circuit has explained: "[t]his statute seeks to balance two competing policy considerations: first, that courts not only be, but seem to be, free of bias or prejudice, and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." In re Boston's Children First, 244 F.3d at 164 (internal citations and quotations omitted). Therefore, as the First Circuit has also stated, the recusal decision must, among other things, reflect "the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." In re Allied-Signal, 851 F.2d at 967.

In this case, a reasonable person would know that I am evidently the first judge to have appointed a Master to investigate the reliability of representations made by lawyers in seeking an award of attorneys' fees in a class action. The Master has recommended that Labaton and some of the other firms that represented the class be ordered to disgorge more than $10,000,000. The Master recommends that I sanction Garrett Bradley personally, refer him for possible discipline by the Massachusetts Board of Bar Overseers, and require additional disgorgement of up to $1,000,000 received by Thornton. The Master also recommended that I find that Sucharow, acting for Labaton, violated its legal and ethical obligations. In seeking my recusal, Labaton wrote that my

70

decisions on the Master's recommendations could result in "serious and far reaching adverse ramifications for at least some of the law firms, and even beyond this investigation for the practice of the Plaintiffs' class action bar . . . ." Docket No. 216-1 at 2. My disqualification would require the reassignment of this case to a judge who is not familiar with its long and complex history.

In these circumstances, my unjustified recusal under §455(a) could encourage the perception that litigants can manipulate the system to veto an unwanted judge. As the First Circuit has repeatedly reiterated, this would be damaging to public confidence in the administration of justice. See In re Allied-Signal, 891 F.2d at 967; In re Bulger, 710 F.3d at 47; In re Boston's Children First, 244 F.3d at 164; In re United States, 441 F.3d at 67; Cigna Fire Underwriters Co., 86 F.3d at 1270.

I am also mindful of the First Circuit's admonition that §455(a) "should not be used by judges to avoid sitting on difficult cases." Snyder, 235 F.3d at 45. It is evident that this will continue to be a demanding case. As careful consideration has persuaded me that my disqualification is not justified, recusal would be an abdication of professional responsibility, which judges have been urged to avoid.

V. ORDER

    Therefore, in view of the foregoing, on June 21, 2018, I denied Labaton's motion for my recusal pursuant to §455(a). <u>See</u> Docket No. 315.


                                   UNITED STATES DISTRICT JUDGE

72